[Civ. No. 12425. Third Dist. July 28, 1971.]

BETTY SCHUMACHER, Plaintiff, Cross-defendant and Respondent, v. ALVIN VAN LOAN GAINES et al.,
Defendants, Cross-complainants and Appellants.

**COUNSEL**

Jay J. Plotkin for Defendants, Cross-complainants and Appellants.

Hauerken, St. Clair, Zappettini & Hines, William J. Braun and Cyril Viadro for Plaintiff, Cross-defendant and Respondent.

**OPINION**

**REGAN, J.**—This appeal is from a judgment for Betty Schumacher upon her complaint filed April 8, 1968 (amended thereafter on October 28, 1968), wherein she sought damages due by reason of waste, for declaratory relief, for mental suffering and for fraud arising from the sale by her to

defendants Alvin Van Loan Gaines and Aileen Wilson Gaines of a ranch in Shasta County, California.

Defendants appeal from the judgment entered on a jury verdict finding them liable for waste ($10,000), breach of contract ($37,208), and punitive damages ($12,500); and from the judgment on appellants' cross-complaint whereby the jury awarded appellants only the sum of $3,060 for overpayment of interest.

Defendants purchased the real property and certain personal property thereon for the sum of $285,000 in November 1966, the terms of sale being a down payment of $45,000, the balance in the sum of $240,000 secured by a note and deed of trust payable over a 10-year period, with interest at 6 percent per annum, with an initial sum of $40,000 interest free, payable at the end of the first year.

The ranch, covering approximately 840 acres, had been used primarily as a summer cattle grazing ranch. A ranch house and guest cabin, both neat and in good condition, were located on the property.

The deed of trust provided that defendants (as trustors) were "to keep said property in good condition and repair; not to remove or demolish any building thereon; to complete or restore promptly and in good and workmanlike manner any building which may [be] constructed, damaged or destroyed thereon and . . . not to commit or permit waste thereof . . . ."

When defendants initially took possession of the property, they intended to maintain a summer cattle ranch. Shortly thereafter they decided to construct a building on the property to be used for a country store and residence quarters for defendants and their employees, and commenced construction of a 70-foot by 100-foot steel Butler stress building on a knoll above an area of the property known as Rye Flat in November 1966. The only plans drawn for the building were for the erection of the shell and slab. Other planning for the building was done on a day-to-day basis, being rough sketches made on wrapping paper. Later, defendants decided to include a storage area, shops, a beer bar, and a restaurant in the building, again without the benefit of detailed or formal plans.

In March 1967 the outer shell of the steel building had been constructed. Thereafter, defendants started on the interior construction of the building, with no plans and with changes being made from time to time. By September 1967 construction of the interior had progressed to the point that most of the wiring, plumbing, duct work and insulation were in place, and it was ready for the application of dry wall.

To the rear of the building, defendants installed two large water tanks and a pump. Two gasoline tanks were also installed near the steel building. Defendants also began the construction of a dam and lake in a meadow area. Fallen trees and debris around this site were not cleared away. There was also land damage caused by erosion.

In order to construct the building a cut was made in the knoll to accommodate the structure. Trees were also felled and not cleared on the construction site and the road leading thereto. In some areas dirt was left piled against trees causing them to die. As a result, in the area around Rye Flat, the scenery was destroyed.

On November 9, 1967, counsel for defendants sent plaintiff a notice of rescission, although no specific grounds were mentioned in such notice. On that same date, defendant Alvin Gaines wrote to plaintiff stating that the notice of rescission was "brought on by the pressures of my wife and attorney," and that he would still like to work something out. However, nothing came of this and defendants failed to make the $40,000 payment which was due on November 10, 1967. Plaintiff then caused a notice of default to be served and recorded declaring the entire unpaid balance of the purchase price to be due and owing. On April 9, 1968, one day after the complaint herein was filed, pursuant to the power of sale in said deed of trust, the trustee sold the subject property to plaintiff at public sale for $243,123.29.[1] Plaintiff was the sole bidder.[2]

Sometime in January 1968, and after the recording of the notice of default, the defendants, through their agent Lee Wurst (also a defendant named in the complaint), completely dismantled and gutted the interior of the steel building. Wiring, insulation, and plumbing, plus other miscellaneous items, were completely ripped out and sold or otherwise disposed of.[3]

Fred Klein, who had been hired by defendants as the building contractor, estimated that the damage caused by defendants to the steel building could

---

[1]The bid was allocated as follows: principal, $240,000; interest, $992.88; attorney's fees, $500; foreclosure costs, $1,630.41.

[2]In ruling upon defendants' motion for judgment notwithstanding the verdict, the trial court comments: "To say that such a bid represents *payment* of the debt is to indulge in what in many cases would be an economic fiction, if not an economic absurdity." No cash was paid out by plaintiff except for expenses for the "public" sale.

[3]The trial court, again in its ruling upon defendants' motion for judgment notwithstanding the verdict, comments: "The removal of fixtures from the new building appears to have been willful, for defendants' obvious gain and for plaintiff's equally obvious loss. To put it bluntly, the building was vandalized and looted. Defendant Gaines' right as trustor in possession saves him from a criminal charge. Punitive damages are not inappropriate."

amount to between $10,000 and $25,000. Robert Bryant, a general contractor, testified that it would cost $37,874 to finish the building as a resort. Bryant also testified that it would cost $10,500 to replace the materials removed from the building.

Plaintiff was of the opinion that the value of her property had decreased to $185,000 because of defendants' use of the property.

James Hull, an appraiser, valued the property at the time of the sale at $185,000, based on comparable sales. In Hull's opinion, the addition of the building added $13,465 to the value of the property. Nevertheless, Hull testified that the building was a "misplaced improvement . . . in virtually a wilderness . . . [representing] a tremendous expenditure of money which by no means could be justified, and which a person would be very difficult to find a buyer in the market that would pay the full value that building represents." Hull stated that the building was suitable only for a "machine storage shed, cattle hay barn, cattle feed out barn or something in conjunction with the main purpose of the property . . . ." However, he also felt that anything removed from the building which did not damage the exterior walls would enhance the value.

Robert Townsend, an appraiser, testified that the property, based upon comparable sales, had a value of $194,000. In Townsend's estimate of value, he appraised the property "as to the salvage value of what now remains . . . ."

According to the defendants, they spent $242,000 on improvements and upkeep of the ranch. Of this amount, $75,983.99 was spent on the steel Butler Building.

Most of the personal property on the ranch which was included in the sale price was sold by defendants. This personal property, valued at $20,000, was not covered by a chattel mortgage.

### Trustee's Sale

Defendants contend that where the beneficiary of a deed of trust has received satisfaction of her indebtedness by purchase of the security at the trustee's sale for the full sum due, the beneficiary cannot recover damages for acts of impairment of the security occurring prior to the foreclosure sale. In other words, the debt is now fully paid and thus plaintiff has no recourse against defendants.[4]

---

[4]It is important to note this action was for damages for waste and breach of contract on the theory the security of real property had, in effect, been substantially devalued by the acts of defendants.

Section 580b of the Code of Civil Procedure provides, in pertinent part: "No deficiency judgment shall lie in any event after any sale of real property for failure of the purchaser to complete his contract of sale, or under a deed of trust, or mortgage, given to the vendor to secure payment of the balance of the purchase price of real property . . . ."

In *Brown* v. *Jensen* (1953) 41 Cal.2d 193 [259 P.2d 425], in holding that the clear import of section 580b of the Code of Civil Procedure was that a creditor taking a purchase money deed of trust on the property may look only to the security, the court states (at p. 197): "Next comes section 580b, *supra*, here involved, which deals with a special type of security transaction, a trust deed, given to secure to the vendor of property the purchase price agreed to be paid by the vendee. That section is necessarily intended to provide a protection for the trustor . . . . The broad protection provision (Code Civ. Proc., § 580b) for purchase money trust deeds stands on a reasonable footing. A purchase money trust deed is not like an ordinary trust deed and note upon which only one action may be brought under section 726. . . . With purchase money trust deeds, however, the character of the transaction must necessarily be determined at the time the trust deed is executed. Its nature is then fixed for all time and as so fixed no deficiency judgment may be obtained regardless of whether the security later becomes valueless.

"The question is, therefore, did plaintiff take a purchase money trust deed on the property when it was purchased? If she did, then section 580b is applicable and she may look only to the security. That is the clear import of the wording of section 580b. The one taking such a trust deed knows the value of his security and assumes the risk that it may become inadequate."

In *Jeanese, Inc.* v. *Surety Title & Gty. Co.* (1959) 176 Cal.App.2d 449 [1 Cal.Rptr. 752], the court in its recognition of the holding in *Brown* v. *Jensen, supra,* states (at p. 454): "Ordinarily where the security is lost or has become valueless, an independent action may be maintained on the debt. [Citation.] But where the security is a purchase money deed of trust or mortgage, the lender must look solely to the security itself, i.e., the land, and no personal judgment may be recovered."

We think the holding in *Brown* v. *Jensen, supra,* to be that section 580b of the Code of Civil Procedure deprives the holder of a purchase money note and deed of trust of *any* remedy other than the right to look solely to the security and no personal judgment may be recovered. The bar of Code of Civil Procedure section 580b applies against deficiency

judgments for enforcement of the obligatory rights flowing from the promissory note secured by the deed of trust.

In support of their contention that Code of Civil Procedure section 580b bars recourse against them in this action, defendants cite no cases which are precisely in point. Nor have we found a California case involving both waste and breach of contract causing impairment of the security. The closest California case supporting defendants' position appears to be *Reynolds* v. *London etc. Ins. Co.* (1900) 128 Cal. 16, 19-20 [60 P. 467], wherein the court states: "But by the foreclosure proceedings and the purchase of the mortgaged premises by the plaintiff for the full amount of the debt and judgment, the debt was fully extinguished, and plaintiff was no longer a creditor or mortgagee . . . ." And on page 21, the court states: "Under these authorities there is no logical answer to the proposition that the sale to plaintiff extinguished the mortgage indebtedness . . . ."

An Iowa case also appears to support defendants' position. (*Kulp* v. *Trustees of Iowa College* (1933) 217 Iowa 310 [251 N.W. 703].)

Decisions from other states are digested in 59 Corpus Juris Secundum, Mortgages, section 334, page 461, as follows: "Where the obligation owing to the mortgagee has been satisfied in full, either by his purchase of the property at execution sale for the full amount of his judgment, or by the acceptance of a conveyance from the mortgagor, then the mortgagee has no further claim to damages for impairment of his security which occurred before the satisfaction of his mortgage indebtedness."

In *Eastland S. & L. Assn.* v. *Thornhill & Bruce, Inc.* (1968) 260 Cal. App.2d 259, 261 [66 Cal.Rptr. 901], the court held: "Modern legislative and case law do not view the defaulting mortgagor (trustor) as a wrongdoer. In California, at least, three statutory provisions especially protect those borrowers who default (Code Civ. Proc., §§ 580, 725a and 726) from being disadvantaged by lenders. (Reisenfeld, *California Legislation Curbing Deficiency Judgments*, 48 Cal.L.Rev. 705.)"

 In *Smith* v. *Allen* (1968) 68 Cal.2d 93, 95-96 [65 Cal.Rptr. 153, 436 P.2d 65], the court held: "Where, as in the present case, the vendor has conveyed the property to the vendee and has taken back a deed of trust which secures the vendee's purchase money note, the contract of sale has been executed, since the object of such a contract is to effectuate a transfer of title. (See Civ. Code, § 1661.) Under such circumstances, upon default by the vendee the rights of the parties are determined by the statutory provisions respecting foreclosures."

 The holding in *Smith* v. *Allen, supra,* is applicable here.

Defendants also contend the jury's verdict awarding them the sum of 

$3,060 in overpayment of interest is mathematically erroneous and assert the sum is $5,992.88. Our examination of the record establishes the jury verdict in this respect was correct.

The judgment upon the jury's verdict awarding plaintiff damages for waste, breach of contract, and punitive damages is reversed. The judgment awarding defendants $3,060 for overpayment of interest is affirmed.

Bray, J.,* concurred.

**PIERCE, P. J.**—I dissent. The majority opinion is an open invitation under the situation existing in this case to any defaulting "equitable" owner (herein for convenience described as the "mortgagor")—and particularly to this one—before moving out to lay waste to the real property which stands as security for the debt. That is not justice; it is not the law; it was not the intent of the Legislature when Code of Civil Procedure sections 580a and 580b were enacted in their present form.

Those sections embrace a complete legislative scheme of foreclosure for defaulted debts. Section 580a covers foreclosure of real property where there is no purchase money mortgage or trust deed and where, therefore, a deficiency judgment can or may be sought. Section 580b covers foreclosure sales where a purchase money deed of trust or mortgage is involved. When a foreclosure sale of the first type is involved, section 580a prevents the "mortgage"-debtor from being gouged by exacting from the beneficiary (*cestui que trust*) or mortgagee (I will, for convenience, refer to him hereinafter by the latter term) the duty, before any deficiency judgment can be sought, to have the court appoint one of the inheritance tax appraisers to appraise and ascertain the fair market value of the secured real property, and a judgment may not be given for any deficiency exceeding that amount. Section 580b, which applies only to purchase money secured debts, flatly wipes out all deficiency judgments. In the event of the foreclosure of such real property mortgage, the Legislature is not in the least concerned with the amount at which the mortgagee bids in the property at the foreclosure sale except as hereinafter noted in the margin. There is no mention of "fair market value." Where no real equity exists in the mortgagor it makes not the slightest difference whether the mortgagee buys the property in for a dollar or for the full amount of the then unpaid balance of the mortgage-debt or whether the amount so bid is or is not the equivalent of the fair market value. Under no circumstances can the mortgagee get a deficiency judgment. All he can do is get back his security by

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

the foreclosure sale.[1] That the security instrument provides, and that the law (§ 580b) guarantees.

The majority opinion displays a myopic concern for one party only to the security transaction and foreclosure—the mortgagor. It unnecessarily penalizes the mortgagee for having insured that he will get back his security (because of the unexpunged default in payment of the debt) or its equivalent in cash by bidding in the property (or instructing some agent to do it for him) at the full amount of the unpaid debt. That—unless the majority opinion shall become law—is what any wise mortgagee would do lest he lose his security. True, when, as here, waste has been committed, he might consult a clairvoyant trying to ascertain the amount in dollars—not of the damage done by the waste committed by the mortgagor, but of the value of his chose in action against the mortgagee and of the judgment he might obtain against him and deduct that from the amount of his bid. I think he would prefer the bird in the hand to the bird in the bush.

I point out that there is no relationship in this, or any, trust deed or mortgage between the provision against the commission of waste written therein and the obligation of the mortgagor to respond in damage for waste committed on the one hand and the provisions regarding the protection of the mortgagee's security interest, including the procedural steps to enforce them under the law on the other hand. The two provisions are entirely separate and distinct.

If a third party had moved onto the property and laid it waste and the mortgagee had acquired both the equitable and legal title (whether by foreclosure or deed from the mortgagor), the manner of his having acquired ownership and the price he paid to get back the property would have no bearing on his choice of action for the tort. It has no greater relevancy to his action ex contractu against the mortgagor who has committed waste. The trial court saw that (see fn. 2 of the majority opinion). The majority opinion, as I see it, fails to see this.

I have no quarrel with the cases cited in the majority opinion. They simply have no relevance to the problem.

I would affirm the judgment.

A petition for a rehearing was denied August 27, 1971, and respondent's petition for a hearing by the Supreme Court was denied September 22, 1971.

---

[1]It is to be noted that we are not concerned in this case with forfeitures. If, for example, but a small amount remains unpaid on the secured debt when the foreclosure sale takes place, and if the mortgagee buys the property in at a sum out of proportion to the value of the property, and if the mortgagor is unable to protect his equity, courts of equity afford adequate protection against such practices and will prohibit a forfeiture.