[Civ. No. 13481. Fourth Dist., Div. Two. Jan. 20, 1977.]

GLENDALE FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff, Cross-defendant and Appellant, v.
MARINA VIEW HEIGHTS DEVELOPMENT COMPANY, INC., et al., Defendants, Cross-complainants and Appellants.

GLENDALE FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff, Cross-defendant and Appellant, v.
MORRIS MISBIN et al., Defendants, Cross-complainants and Appellants.

106

110

112

**COUNSEL**

McKenna & Fitting, Les J. Weinstein, Aaron M. Peck and Alan Holmberg for Plaintiff, Cross-defendant and Appellant.

Hill, Farrar & Burrill, Jack R. White, William M. Bitting, Rex W. Kellough and John N. McLaurin for Defendants, Cross-complainants and Appellants.

**OPINION**

TAMURA, J.—These consolidated appeals involve a dispute between a lending institution (hereafter Glendale) and a corporate land developer (hereafter Marina View) and its principals (Morris Misbin and William E. Holmes) over their respective rights and obligations under certain

loan and guarantee agreements. The developers defaulted, the lending institution commenced nonjudicial foreclosure proceedings, and this litigation ensued.

## FACTS

At this point we shall set forth only the basic facts common to all of the appeals. Additional facts pertinent to the specific issues raised by the parties will be reviewed in subsequent portions of this opinion as we deal with those issues.

### The Properties Involved

The properties which are the subject of the loan transactions are located south of the San Diego Freeway in the City of San Juan Capistrano and are known as the "Reed Ranch" (approximately 1,220 acres), "Window Hill" (approximately 85 acres), and "Krum Ranch" (approximately 420 acres). At the time loan negotiations between the parties commenced, Marina View was the owner of Reed Ranch and Window Hill and Glendale was the owner of Krum Ranch. Krum Ranch which Glendale had acquired by deed in lieu of foreclosure from a former developer was partially developed with a golf course and condominiums. Except for some basic grading on Window Hill, Reed Ranch and Window Hill were unimproved.[1] Krum Ranch and Reed Ranch were abutting properties with a large area of unstable earth overlapping their common boundary.

### Loan Negotiations

In early 1967 Marina View approached Glendale for a $2 million loan for the development of Window Hill. Glendale declined to make the loan but negotiations continued culminating in a single transaction whereby Glendale agreed to sell Krum Ranch to Marina View on credit, to lend Marina View funds to grade and install offsite improvements on Window Hill, and to provide Marina View with funds to perform earth stabilization work along the common boundary of Reed Ranch and Krum Ranch. Marina View proposed that the transaction be handled by two separate loan agreements and trust deeds, one on Krum

---

[1]The grading on Window Hill was done in conjunction with the development of an adjoining parcel owned by Darmi, Inc., a corporation owned by Misbin.

Ranch and the other on Reed Ranch and Window Hill, but Glendale insisted on a single note and trust deed covering all three parcels.

*The Loan Agreement*

On June 9, 1967, the parties entered into a written agreement which included the following pertinent terms:

(1) Marina View agreed to buy the Krum Ranch for $6,767,000.

(2) Glendale agreed to lend Marina View $8,767,000 to finance the acquisition of Krum Ranch and to provide funds for the improvement of Window Hill with grading and offsite improvements.

(3) The loan was to be secured by a first trust deed on the three parcels.

(4) Glendale agreed to act as escrow holder and to make the following advances and disbursements on the close of escrow: (a) Advance $7,140,000 to be disbursed as follows: $6,767,000 to Glendale for the purchase price of Krum Ranch, $360,000 to Glendale for prepaid interest and $13,000 for closing costs; (b) Advance $1,627,000 to Marina View "primarily for the purpose of completing the offsite improvements on the Window Hill property" to be disbursed as follows: $1,620,000 to be transmitted to Marina View at close of escrow, $7,000 to be held by Glendale for closing costs incident to this part of the loan.

(5) Marina View agreed that within 18 months after the close of the escrow it would complete the grading and construction of offsites on Window Hill.

(6) The agreement called for the personal guaranties of Misbin and Holmes that the improvements on Window Hill would be completed.

(7) Marina View agreed to undertake geological and engineering studies for the correction of the unstable soil condition (estimated to cover approximately 400 acres) along the common boundary of Krum Ranch and Reed Ranch, the studies to include costs estimates of the remedial work necessary to make the land suitable for residential construction. The studies were to be completed and transmitted to Glendale within 12 months of the close of escrow.

(8) Glendale agreed to lend up to $2½ million to correct the soil condition.

(9) Misbin and Holmes were required to execute "personal guaranties of the completion of such improvements [slide stabilization] and payments therefor. . . ."

(10) Marina View agreed that within 12 months of the close of escrow it would develop and transmit to Glendale a tentative master plan for the development of all of the properties covered by the trust deed.

(11) Marina View agreed to construct condominium units on a portion of the Krum Ranch which had been prepared for such use and Glendale agreed to make further advances or new loans for such purposes.

(12) Marina View agreed to operate and maintain the existing golf course and club house located on Krum Ranch.

On June 15, 1967, the escrow closed and the deed of trust securing Marina View's indebtedness to Glendale was recorded.[2]

At the close of escrow the net sum of $1,233,570.45 was disbursed to Marina View in cash from the $1,654,689.72 loan proceeds for the improvements to be made on Window Hill.[3]

*The Slide Stabilization Loan*

In 1968 Marina View made preparations to proceed with the slide stabilization project by submitting to Glendale engineering studies for the project, with a cost estimate of approximately $4½ million and by obtaining county approval for the first 268 acres of the project. In October 1968 Glendale made a $2½ million loan to Marina View for the project as a secured advance under the

---

[2] Before the close of escrow, the parties executed an amendment to the June 9 agreement, slightly modifying some of the amounts mentioned in that agreement. Among the modifications, the purchase price of Krum Ranch was changed from $6,767,000 to $6,753,343.58 and the total amount of the loan was changed from $8,667,000 to $8,785,000.

[3] At the direction of Marina View, the sum of $421,119.27 was disbursed to United California Bank in order to discharge an existing recorded lien on Reed Ranch and Window Hill.

original trust deed. The loan was evidenced by a document entitled "Building Loan Agreement" for the construction of improvements consisting primarily of "grading and offsite improvements." Misbin and Holmes executed a document entitled "Building Contract Guaranty Agreement" which provided that in consideration of the loan, they individually guaranteed that Marina View would furnish all labor and materials "necessary for the construction of said building or buildings, and will fully complete the construction of same promptly and in accordance with . . . the terms and conditions" of the "Building Loan Agreement."

## The Condominium Construction Loan

Contemporaneously with the slide stabilization loan, Glendale made a new loan of $963,200 for the construction of condominiums on Krum Ranch. The loan was accomplished by releasing from the security of the original trust deed that portion of Krum Ranch on which the condominiums were to be built and by securing the new loan by a separate trust deed on the released property.[4]

## Marina View's Performance

The slide stabilization and the condominium construction loan transactions were closed on October 22, 1968. Thereafter Marina View commenced work on the slide area, drawing on the $2½ million loan fund by vouchers in favor of the general contractor for that project.[5]

By December 1968 (the expiration date of the 18 months for the completion of grading and offsite improvements on Window Hill), Marina View had expended not more than $609,930 for grading on Window Hill but had performed no additional work. A minimum of $623,000 of the loan proceeds earmarked for improvement work on Window Hill had been diverted by Marina View and Misbin and Holmes to other uses and purposes.

[4] The $963,200 loan was used to reduce the original indebtedness by $222,012 and to provide Marina View with a $717,697 construction loan for the construction of condominiums on Krum Ranch.

[5] The general contractor was Farmi, Inc. in which Misbin had a controlling interest.

*Marina View's Default*

In the ensuing months, Marina View failed to pay the installments of principal and interest due on the notes secured by the trust deeds, failed to pay the real property taxes, failed to construct offsite improvements on Window Hill, and failed to complete the slide stabilization project. Glendale withheld institution of foreclosure proceedings in order to give Marina View the opportunity to make other financial arrangements to cure its defaults but it was unable to do so.

*Nature of the Litigation*

In June 1970 Glendale recorded a notice of default on both the original trust deed and the trust deed securing the condominium construction loan and filed an action for injunction and for the appointment of a receiver to operate the golf course and club house on the Krum Ranch pending foreclosure. Marina View answered and cross-complained for rescission of the loan agreements on the ground of fraud and for a judicial declaration that the rights and obligations of the parties were fixed by an oral agreement entered into before the execution of the loan agreements.

Glendale thereafter filed a separate action against Misbin and Holmes for damages for breach of the completion guarantee agreements with respect to the Window Hill improvements and the slide stabilization project. Misbin and Holmes answered and cross-complained for rescission and declaratory relief on essentially the same grounds alleged by Marina View in its cross-complaint in the first action.

In January 1971 Glendale filed in its first action a "cross-complaint" for damages for fraud against Misbin and Holmes alleging in substance: At the time the loan transaction was entered into, Misbin and Holmes falsely represented that Marina View intended to comply with all of the terms and conditions of the loan agreements; Misbin and Holmes never intended to have Marina View repay the loan in accordance with the terms of the agreements, intending instead to repay only if and when profits were realized from the use or sale of the properties, and they never intended to have Marina View install the offsites on Window Hill as agreed. The cross-complaint prayed for $11½ million (approximately the full amount of the loan) as compensatory damages and $2 million exemplary damages. Misbin and

Holmes answered with general denials and a number of affirmative defenses, including the defenses that the cross-complaint was barred by the antideficiency statutes (Code Civ. Proc., §§ 580b, 580d) and by the doctrine of election of remedies.

Before trial Glendale was permitted to amend its complaint in the completion guarantee action and its "cross-complaint" for fraud in the first action by adding to each the allegation that Misbin and Holmes, in violation of the written agreement and in violation of Penal Code section 484b, wrongfully diverted monies earmarked for the Window Hill improvements to other uses and purposes thereby reducing the value of Marina View's equity in Window Hill and the value of Glendale's security interest.

On August 10, 1971, Glendale completed foreclosure proceedings and purchased the properties at a nonjudicial sale for a credit bid of $6,650,000 against a net unpaid secured indebtedness of $10,989,642.91 leaving a deficiency of $4,339,642.91.

*Findings*

Following a lengthy consolidated trial, the court made extensive findings and conclusions. The salient findings may be summarized as follows:

All prior negotiations, representations, statements and oral understandings were merged in and superseded by the written agreements and the writings constituted the complete contractual agreements of the parties. Glendale made no false representations or promises to induce Marina View and Misbin and Holmes to enter into the loan and guarantee agreements.

Marina View's failure to pay the installments of principal and interest and the real property taxes, its failure to complete the offsites on Window Hill, and its failure to complete the slide stabilization project constituted breaches of its obligations under the written agreements and justified Glendale in refusing to pay out additional loan funds for the slide stabilization project and in accelerating the notes.

Misbin and Holmes' failure to complete offsites on Window Hill constituted a breach of their completion guarantee agreement. Misbin

and Holmes' guaranty in connection with the slide stabilization loan was intended "to be a guaranty that Marina View would faithfully spend . . . the money disbursed to it by Glendale Federal for [the project]"; Misbin and Holmes' obligation under their guarantee agreement was "to complete [the project] to the extent, if any, that Marina View did not satisfactorily spend on [the project] the money disbursed to it by Glendale Federal for [the project]"; although Marina View failed to complete the work, it was in progress when Glendale cut off the loan funds; all of the funds disbursed ($1,458,535) were used on the project and none were diverted to other uses; the lands on which the work was performed received the full benefit of the funds disbursed; Glendale applied the balance of the loan proceeds for the project to reduce Marina View's indebtedness; in view of the work performed and Glendale's retention of the undisbursed balance of the loan, Glendale suffered no damage as a result of Misbin and Holmes' failure to complete the project in accordance with their written guarantee agreement.

Misbin and Holmes, acting on behalf of Marina View, fraudulently and in bad faith, diverted a minimum of $623,000 of the loan proceeds earmarked for the Window Hill offsites to other uses and purposes, including: (1) To finance Darmi, Inc., a corporation controlled by Misbin; (2) to purchase and improve a residence for the use of Mr. Reed, a director of Marina View; and (3) to the use and benefit of Mr. and Mrs. Holmes.

At the time the loan was made in 1967, the market value of the properties exceeded the amount of the loan; as of the date of foreclosure (Aug. 10, 1971), the market value of the three properties, if sold for cash as a single parcel, was $8,500,000 but if sold for cash as separate parcels was $9,300,000 (Krum Ranch $5,000,000; Reed Ranch $2,500,000; Window Hill $1,800,000); if the properties were sold on typical financing terms, the values would be 20 percent higher.

As of August 10, 1971, the total secured indebtedness was $10,989,642.91; because Glendale was not fully secured on that date, it is entitled to recover from Misbin and Holmes as damages the loss of the enhancement in value of the security occasioned by the fraudulent diversion of the loan funds and the breach of the guarantee agreement to complete the Window Hill offsites; the loss in the value of the security was $700,000; the cost of completing the Window Hill offsite improvements was $900,000.

Misbin and Holmes were guilty of oppression, bad faith, and fraud in diverting the loan proceeds earmarked for Window Hill to other uses and purposes.

*The Judgment*

The court concluded that Glendale was entitled to a judgment for damages against Misbin and Holmes in the following amounts: $700,000 compensatory damages for the loss in the value of the security occasioned by the diversion of funds and the breach of the Window Hill completion guarantee agreement; $100,000 exemplary damages ($50,000 against each); $100,000 as reasonable attorneys' fees in the enforcement of the Window Hill completion guarantee agreement and $30,000 in attorneys' fees incurred by Glendale in pursuing its cause of action for damages for fraud. The court also concluded that Marina View and Misbin and Holmes should take nothing on their respective cross-complaints for rescission and declaratory relief. Judgment was entered in accordance with the findings and conclusions.

*The Appeals*

Glendale appeals from the judgment on the ground the awards were inadequate as a matter of law. Misbin and Holmes cross-appeal on the ground the damage awards against them were improper as a matter of law. Marina View and Misbin and Holmes filed a separate appeal from the adverse judgment on their respective cross-complaints for rescission and declaratory relief. The several appeals will be considered seriatim.

### GLENDALE'S APPEAL

Glendale attacks the adequacy of the damage awards on the following grounds: (1) The court failed to award Glendale all damages to which it was legally entitled on its cause of action for breach of the Window Hill guarantee agreement; (2) the court erred in failing to find and award damages for breach of the slide stabilization guarantee agreement; (3) the court failed to award Glendale all of the damages to which it was legally entitled on its cause of action for fraud; and (4) the awards for exemplary damages and attorneys' fees were inadequate.

For the reasons which follow, we have concluded that Glendale's assault upon the adequacy of the awards must fail.

I

■ Preliminarily we point out that a failure to move for a new trial ordinarily precludes a party from complaining on appeal that the damages awarded were either excessive or inadequate, whether the case was tried by a jury or a court without a jury. (*Schroeder* v. *Auto Driveaway Co.,* 11 Cal.3d 908, 918-919 [114 Cal.Rptr. 622, 523 P.2d 662] [jury trial, excessive damages]; *Bate* v. *Jolin,* 206 Cal. 504, 508 [274 P. 971] [nonjury trial, excessive damages]; *Mendoyoma, Inc.* v. *County of Mendocino,* 8 Cal.App.3d 873, 877 [87 Cal.Rptr. 740] [nonjury trial, inadequate damages]; *Sholar* v. *Barker,* 211 Cal.App.2d 31, 32-33 [27 Cal.Rptr. 451] [nonjury trial, excessive damages]; *Jenkins* v. *Dahnert,* 202 Cal.App.2d 567, 568 [21 Cal.Rptr. 15] [jury trial, inadequate damages]; *Reid* v. *Gillespie,* 87 Cal.App.2d 769, 771 [197 P.2d 566] [nonjury trial, excessive damages].) The rule is a sound one. The trial court is in a better position than a reviewing court to determine whether a jury verdict was influenced by passion or prejudice. Moreover, the power to weigh the evidence and resolve issues of credibility is vested in the trial court, not the reviewing court. (*Schroeder* v. *Auto Driveaway Co., supra,* 11 Cal.3d 908, 919.) Consequently, where the ascertainment of the amount of damage requires resolution of conflicts in the evidence or depends on the credibility of witnesses, the award may not be challenged for inadequacy or excessiveness for the first time on appeal. To permit a party to do so without a motion for new trial would unnecessarily burden reviewing courts with issues which can and should be resolved at the trial court level. (*Schroeder* v. *Auto Driveaway Co., supra,* 11 Cal.3d 908, 919.)

The failure to move for a new trial, however, does not preclude a party from urging legal errors in the trial of the damage issue such as erroneous rulings on admissibility of evidence, errors in jury instructions, or failure to apply the proper legal measure of damages. (*Mendoyoma, Inc.* v. *County of Mendocino, supra,* 8 Cal.App.3d 873, 877-878; *Schmidt* v. *Macco Construction Co.,* 119 Cal.App.2d 717, 721 [260 P.2d 230].) In the case at bench, Glendale failed to move for a new trial. Accordingly, it is precluded from attacking the adequacy of the awards except insofar as errors of law were committed by the court below in ascertaining the amount of damage. With the foregoing principles in mind, we turn to Glendale's attack on the adequacy of damages awarded for the breach of the Window Hill guarantee agreement.

## II .

█ The trial court determined that if Glendale was fully secured on the date of the foreclosure sale it would have suffered no damage either as a result of the diversion of loan funds earmarked for Window Hill or by reason of the failure to complete the improvements. However, having found that Glendale was not then fully secured, the court determined that Glendale was entitled to recover as damages the "loss of security" caused by the diversion of funds and the breach of the guarantee agreement. The "loss of security" was found to be $700,000.

Glendale contends that the proper measure of damages for the breach of a construction contract is the amount required to bring the property into the condition it would have been had the contract been fully performed and not the loss of enhancement in value resulting from the failure to perform. The court having found that it would cost $900,000 to complete the Window Hill offsites, Glendale urges that it should have been awarded at least that amount. Inasmuch as the contention goes to the proper measure of damages, it presents a reviewable legal issue despite Glendale's failure to move for a new trial.

The pertinent general legal principles applicable to the measure of damages for breach of contract are well settled. Except as otherwise provided by statute, the measure "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.) █ Damages awarded should, insofar as possible, place plaintiff in the same position he would have been had the contract been performed, but he should not be awarded more than the benefit which he would have received had the promissor performed. (See *Coughlin* v. *Blair,* 41 Cal.2d 587, 603 [262 P.2d 305].)

█ The proper measure of damages for breach of a contract to construct improvements on real property where the work is to be done on plaintiff's property is ordinarily the reasonable cost to the plaintiff of completing the work and not the difference between the value of the property and its value had the improvements been constructed. (*Jones* v. *Kvistad,* 19 Cal.App.3d 836, 843 [97 Cal.Rptr. 100]; *Kitchel* v. *Acree,* 216 Cal.App.2d 119, 123 [30 Cal.Rptr. 714]; *Shell* v. *Schmidt,* 164 Cal.App.2d 350, 357-366 [330 P.2d 817, 76 A.L.R.2d 792] [cert. den., 359 U.S. 959 (3 L.Ed.2d 766, 79 S.Ct. 799)]; see *Coughlin* v. *Blair, supra,* 41 Cal.2d 587,

600.) A different rule applies, however, where improvements are to be made on property not owned by the injured party. "In that event the injured party is unable to complete the work himself and, subject to the restrictions of sections 3300 and 3359 of the Civil Code, the proper measure of damages is the difference in value of the property with and without the promised performance, since that is the contractual benefit of which the injured party is deprived." (*Coughlin* v. *Blair, supra,* 41 Cal.2d 587, 600; *Rakish* v. *Valerga,* 125 Cal.App.2d 274, 277-278 [270 P.2d 50]; see *Scott* v. *TraveLodge Corp.,* 265 Cal.App.2d 881, 883 [71 Cal.Rptr. 547].)

Glendale was not the owner of the property upon consummation of the loan transaction. Nor was its interest that of a joint venturer or partner. The court specifically found that Glendale and Marina View did not enter into a "contract or agreement with each other to form or formed a joint venture, partnership, or any other arrangement for the joint development of the subject property or any part thereof." Glendale's interest in the land was solely that of a secured lender. The terms of the loan agreement obligating Marina View to use the loan proceeds to construct the Window Hill offsites and requiring Misbin and Holmes' personal guaranty of completion were designed to enhance the value of the property and thereby provide Glendale added security for its loan. The measure of damages, therefore, is the value which the improvements, had they been completed, would have added to the security because that is the contractual benefit of which Glendale was deprived. In other words, Glendale was entitled to damages only to the extent noncompletion of the improvements impaired its security interest. If Glendale had been fully secured on the date of foreclosure, it would have suffered no injury by reason of the failure to construct the improvements and would not have been entitled to damages. Or if, despite its failure to complete the improvements, Marina View had repaid the indebtedness, Glendale would have suffered no damage and manifestly could not have successfully prosecuted an action for breach of the completion guarantee agreement.

While the question appears to be one of first impression in California, it has long been the general rule in other jurisdictions that where a mortgagee has made a loan or an advance for the construction of improvements on the mortgaged property and, in order to strengthen his security, has required a surety bond guaranteeing completion of the improvements, in an action for breach of the bond, recovery is limited to

the injury to the mortgagee's security interest which is measured by the difference between the value of the property with and without the completed improvements. (*Prudence Co.* v. *Fidelity & Deposit Co.,* 297 U.S. 198, 205-207 [80 L.Ed. 581, 584-585, 56 S.Ct. 387]; *Trainor Co.* v. *Aetna Cas. & S. Co.,* 290 U.S. 47, 55-56 [78 L.Ed. 162, 166, 54 S.Ct. 1]; Ann., Agreement to Protect Mortgagees—Damages, 103 A.L.R. 1395, 1396, 1397; 55 Am.Jur.2d, § 264, p. 357.) The rule is a sound one because, as we have explained, the bargained-for contractual benefit of which the mortgagee has been deprived is the value which the improvements would have added to the security.

Glendale argues that since it is now the owner, having acquired the property at the foreclosure sale, it is in the same position as an owner suing for breach of an agreement to construct improvements on his property. This strained argument must fail. ■ It is a settled principle that general damages that may be awarded for breach of contract are ordinarily confined to those which would naturally arise from the breach, or which might have been reasonably contemplated or foreseen by the parties at the time they contracted, as the probable result of the breach. (Civ. Code, § 3300; *Hunt Bros. Co.* v. *San Lorenzo etc. Co.,* 150 Cal. 51, 56 [87 P. 1093]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) § 639, pp. 542-543.) At the time the loan transaction was entered into, Marina View's agreement to construct the Window Hill offsites and Misbin and Holmes' guaranty were intended as additional security devices only, not a contract to construct improvements on Glendale's land.

■ Glendale further argues that inasmuch as the guarantee agreement provides that its rights under the agreement survive foreclosure and since it is now the owner, it is entitled to damages based upon the cost of completing the improvements. This contention is likewise without merit. While Glendale's rights under the guarantee agreement were not extinguished by foreclosure, the right that survived was the right to sue for damages for breach of the agreement. We fail to see how survival of that right transformed Marina View's June 1967 agreement to improve Window Hill into a contract for the construction of improvements on Glendale's land.

Finally, Glendale contends that even assuming that the trial court applied the proper measure of damages, it should have found the difference in value to be the cost of completing the offsites which, according to the court's finding, was $900,000. This contention must also

fail. In the first place, the evidence pertaining to the difference in value was conflicting. While the cost of completion was a relevant consideration, the court also had before it Misbin's testimony that completion of the Window Hill offsites would have been a fruitless endeavor because of the absence of a freeway access to the property. The trial court's implied finding that completion of the offsites would not have enhanced the value of the property to the extent of the actual cost of completing them is thus amply supported by the record. ■ In the second place, the trial court did apply the proper measure of damages and did determine their amount by resolving conflicting evidence and judging the credibility of the witnesses; Glendale is, therefore, precluded from challenging the adequacy of the award because of its failure to move for a new trial.

### III

Glendale next contends that the court erred in failing to find, and to award damages for, breach of the slide stabilization guarantee agreement.

Glendale is in error in assuming that the court failed to find that Misbin and Holmes breached their obligation to complete the slide stabilization project. As we interpret the findings, the court found that Misbin and Holmes breached their guarantee agreement but found that Glendale suffered no damage as a result of the breach.

The court's findings with respect to this project included the following: Marina View was obligated to perform remedial work to stabilize the slide condition bordering Krum Ranch and Reed Ranch; Misbin and Holmes guaranteed completion of the project; the parties contemplated that the $2½ million loan evidenced by the October 1968 loan agreements would accomplish the work; Marina View commenced performance and continued the work until June 24, 1974, when Glendale justifiably cut off further disbursement of loan funds because of Marina View's default in the repayment of the principal and interest on the loan; Marina View faithfully spent all funds disbursed to it in performance of the work; Misbin and Holmes' guarantee agreement was intended to guarantee "that Marina View would faithfully spend . . . the money disbursed to it" on the project; the land on which the work was performed received the full benefit of the disbursed funds; Glendale applied the balance of the undisbursed funds to reduce Marina View's indebtedness.

Glendale interprets the finding that Misbin and Holmes guaranteed that all funds disbursed to Marina View would be spent on the project and that Marina View did faithfully do so to mean that the court found no breach of the guaranty. The findings are to the contrary. The court went on to make a specific finding that Marina View breached its agreement "by failing and refusing to complete [the project]" and that Misbin and Holmes breached their agreement "by failing and refusing to complete [the project]." The finding that Misbin and Holmes breached their guarantee agreement to complete the project is consistent with the finding that they guaranteed Marina View's faithful expenditure of the loan funds on the project and that it did so. In finding that Misbin and Holmes breached their guarantee agreement despite the finding that all disbursed funds were faithfully spent on the project, the court impliedly determined that the guarantors had a twofold obligation: (1) To see that disbursed funds were spent on the project and (2) to complete the project as contemplated by the parties.

The court declined to award Glendale damages for breach of the completion guarantee agreement because it found that Glendale suffered no damage. It found that since the land on which work was performed received the full benefit of the funds disbursed for the project and that since Glendale retained the balance of the $2½ million loan, Glendale "did not suffer any loss of security by reason of the failure of Marina View to perform further work on such project after June 24, 1970" and that accordingly Glendale "suffered no damage as a result of Misbin and Holmes' failure to perform under their guaranty."

Thus, the real issue is whether the court erred in failing to award damages. Glendale argues it is entitled to recover the cost of completing the slide stabilization project which it asserts is in the range of $1,600,000 to $2 million. As it has with respect to the Window Hill guarantee agreement, Glendale seeks to apply the measure of damages for breach of a contract to improve an owner's land. As we have explained, that measure is inapplicable. The slide stabilization guarantee agreement, like the Window Hill agreement, was simply a device to strengthen Glendale's security for its loan. Accordingly, the proper measure of damages is the difference in value with and without the contemplated improvements. The court found that when the $2½ million loan for the project was made, the parties contemplated that the loan would cover the cost of the remedial work and that work would be performed and completed to that extent. As we have heretofore noted,

damages for breach of contract should only be such as may have been reasonably within the contemplation of the parties at the time they contracted. In finding that Glendale suffered no damage, the court determined that the enhancement in the value of the security had the work been completed as contemplated would not have exceeded the value added to the land by the work actually performed plus the amount of the undisbursed funds which Glendale retained and applied to Marina View's indebtedness. In effect the court determined that Glendale is . in the position it would have been if the project as contemplated by the parties had been completed. Since there was no evidence that the difference in value would have been greater if the work to the extent contemplated had been completed, the trial court's determination must be upheld.

Glendale again makes the argument that its rights against Misbin and Holmes under the slide stabilization guarantee agreement survived foreclosure and that, therefore, it is entitled to recover as damages the cost of completing the project. Our reasons for rejecting that argument in connection with the Window Hill guarantee agreement are equally apposite here.

We conclude that Glendale's attacks upon the court's findings and conclusions concerning the slide stabilization guarantee agreement are nonmeritorious.

## IV

Glendale next contends that the court failed to award all the damages to which it was entitled on its cause of action for fraud. It urges that it should have been awarded compensatory damages in the full amount of the deficiency ($4,187,501.08) as well as larger punitive damages and more attorneys' fees. For the reasons to be stated, we reject the contention.

The court found fraud, oppression and bad faith on the part of Misbin and Holmes for the diversion of funds earmarked for the Window Hill improvements and determined that the tortious conduct deprived Glendale of the enhancement in value of its security to the extent of $700,000. However, the court decided that the damage was "duplicative" of that awarded for breach of the completion guarantee agreement and that, therefore, any payment applied towards the satisfaction of the one

would constitute a pro tanto payment of the other. Accordingly, in its judgment, the court made a single compensatory award of $700,000 for breach of contract and fraud.

Glendale assails the adequacy of the compensatory award on two grounds: (1) Despite the court's finding that Misbin and Holmes perpetrated a fraud in falsely representing and promising that Glendale's trust deed would be a first lien on the properties, the court erroneously failed to award damages for that fraud and (2) Misbin and Holmes were guilty of promissory fraud in that at the time the loan agreements were entered into, they never intended to have Marina View repay the loan or perform the other terms and conditions of the agreement as promised. We address those contentions seriatim.

Glendale argues that the court found that Misbin and Holmes perpetrated a fraud in that they never intended to have Marina View give Glendale a first trust deed on the properties but instead intended the trust deed to be subordinate to an "unrecorded mortgage" on Reed Ranch and Window Hill in favor of Holmes and Reed. It is urged that the court erred in failing to award damages sustained by Glendale as a result of that fraud.

The facts pertaining to the "unsecured mortgage" were as follows: Reed, one time sole owner of the "original" Reed Ranch comprising some 2,626 acres, conveyed a half interest in the "original" ranch to Holmes. In 1962 Reed and Holmes conveyed a portion of the ranch to Darmi, Inc. (the corporation controlled by Misbin). In 1965 Misbin, Holmes and Reed formed Marina View and Reed and Holmes conveyed to Marina View those portions of the "original" Reed Ranch referred to in this litigation as "Reed Ranch" and "Window Hill." In consideration for that conveyance, Reed and Holmes took a purchase money note for $3,375,000 secured by an unrecorded trust deed on the two parcels. The trust deed provided that it would be "subordinate to and subject to further subordination to a loan or loans in the aggregate of not more than $5,000,000." Reed and Holmes promised not to record the trust deed so long as there was no default and the document remained in the custody of the First American Title Insurance Co. (First American).

Several days before the June 1967 loan transaction was to close, Marina View's attorney orally informed a Glendale official of the existence of an unspecified off-record lien on Reed Ranch and Window

Hill. Glendale immediately contacted First American and obtained its assurance that the trust deed in favor of Glendale would not be recorded until the "unsecured mortgage" had been eliminated and a proper title policy could be written. First American prepared a subordination agreement and requested Misbin to have it signed. Misbin stated that he was unable to do so because Mr. Reed was away and prevailed upon First American to record Glendale's trust deed and to issue a title policy on the assurance that the subordination agreement as well as an indemnity agreement would be executed. The loan transaction was closed and First American issued its title policy to Glendale insuring its deed of trust as a first lien.

When Glendale commenced the instant litigation, Misbin, Holmes and Reed, on advice of their counsel, had First American record the "unrecorded mortgage," caused chapter XI bankruptcy proceedings to be initiated on behalf of Marina View, and obtained a temporary injunction from the bankruptcy court restraining Glendale from proceeding with its foreclosure. Following hearings, however, the bankruptcy court issued an order declaring that the restraining order would be dissolved unless the "unrecorded mortgage" was forthwith subordinated to Glendale's trust deed. Marina View, Misbin, Holmes and Reed thereupon recorded a subordination of the "unrecorded mortgage." Following further proceedings, the bankruptcy court determined that there was no "realizable equity" in the properties to pay Marina View's unsecured creditors and permitted Glendale to proceed with foreclosure.

The trial court found that several days before the loan transaction was closed Marina View disclosed to Glendale the existence of an unspecified off-record agreement concerning Reed Ranch and Window Hill but that the details and terms of the lien were not revealed; Marina View, Misbin and Holmes "represented that said off-record agreement, to the extent it constituted a lien or charge against the property, would be eliminated or subordinated to Glendale's lien prior to the recording of the loan transaction"; "Misbin, Holmes and Marina View, and each of them, had no intention to so subordinate said off-record agreement, and at the time the loan transaction was recorded, Marina View, Misbin and Holmes failed to have the off-record trust deed made junior and inferior to Glendale's trust deed and did not do so until the bankruptcy court ordered that Glendale would be permitted to foreclose unless they did"; Marina View caused the off-record trust deed to be recorded on

September 24, 1970, and thereafter sought an order in the bankruptcy court enjoining Glendale from proceeding with its foreclosure on the ground the off-record trust deed was a senior lien.

Based upon the foregoing findings, Glendale urges that the court found that Misbin and Holmes were guilty of fraud in connection with the "unrecorded mortgage." We agree. Misbin and Holmes respond that the findings cannot be so construed because the court rejected Glendale's request for a specific finding of fraud. However, it would be pure speculation whether Glendale's request was rejected because the court felt that the findings to which we have alluded adequately disposed of the fraud issue or whether it was rejected because the court felt that fraud had not been established. We agree with Glendale that a fair interpretation of the court's findings is that Misbin and Holmes were guilty of fraud in falsely representing that they would subordinate the "unrecorded mortgage."

The court found, however, that except for $30,000 in attorneys' fees incurred by Glendale in connection with the bankruptcy proceedings initiated by Marina View, a subject which we shall discuss later in this opinion, Glendale suffered no damage as a result of the fraud. There is substantial evidence to support that finding. Glendale received a policy of title insurance insuring its trust deed as the first lien on the property; the "off-record mortgage" was ultimately subordinated to Glendale's trust deed; and Glendale foreclosed and acquired title to all of the property. Neither Marina View nor Misbin and Holmes have challenged the priority of Glendale's trust deed on subject property.[6] We conclude that Glendale's contention that it was entitled to additional damages for fraud on the basis of the "unrecorded mortgage" must be rejected.

Glendale also argues that Misbin and Holmes were guilty of promissory fraud in that they never intended to have Marina View repay the indebtedness or perform other terms and conditions of the loan agreements as promised and that, therefore, it was entitled to recover the entire deficiency as damages for fraud. This was the thrust of Glendale's "cross-complaint" for fraud against Misbin and Holmes. The cross-complaint alleged that at the time the parties entered into the June 1967

[6]The "unrecorded mortgage" could not have affected the status of Glendale's first trust deed insofar as it pertained to Krum Ranch or Glendale's 1968 trust deed securing the condominium construction loan for Krum Ranch.

loan agreement, Misbin and Holmes never intended to have Marina View repay the loan as agreed but had a secret plan to repudiate the written agreements and claim that the rights and obligations of the parties were fixed by an oral agreement. However, the court found against Glendale on those allegations; it found that at the time the loan agreements were executed, Misbin and Holmes knew that it would be difficult to meet the payment schedule and fulfill the terms of the agreements within the time specified but that "they intended to fully perform if they had sufficient cash to do so." It also found that Misbin and Holmes were not guilty of fraud in connection with the execution and performance of the slide stabilization guarantee agreement. In short, the only fraud which the court found and for which it awarded Glendale damages was in connection with the misuse of the Window Hill loan proceeds and the "unrecorded mortgage." The evidence on the issue of fraud was conflicting. It was for the trial court to pass on the credibility of the witnesses and to determine the weight to be given their testimony. No useful purpose would be served in extending this opinion by reviewing all of the pertinent evidence; suffice it to say that the record discloses substantial evidence supporting the trial court's findings on the issues of fraud.

Glendale's contention that the compensatory damages for fraud were inadequate as a matter of law must be rejected.

V

█ Finally, Glendale urges that the amounts awarded for punitive damages and attorneys' fees were inadequate. The adequacy of those awards, however, is a matter which should have been first addressed to the trial court on a motion for a new trial. Having failed to do so, Glendale is precluded from raising the issue for the first time on appeal.

### CROSS-APPEAL OF MISBIN AND HOLMES

Misbin and Holmes have cross-appealed from that portion of the judgment awarding damages and attorneys' fees to Glendale. They contend that there was no legal basis for the awards, either for fraud or for breach of the Window Hill guarantee agreement. Although some of the contentions overlap both causes of action, the attacks upon the awards based on each cause of action will be considered separately.

# I

## DAMAGES FOR FRAUD

### A. *Propriety of the Punitive Damages Award*

It is urged that the award of punitive damages was based on a finding that the diversion of funds constituted a bad faith breach of the agreement and that inasmuch as punitive damages ordinarily cannot be awarded for bad faith breach of a contract, the award in question was improper. We are unpersuaded. The court's findings support the award of punitive damages on the theory of promissory fraud.

A promise made without any intention of performing it constitutes fraud. (Civ. Code, § 1710, subd. 4.) " 'A promise to do something necessarily implies *the intention to perform,* and, where such an intention is absent, it is an implied misrepresentation of fact, which is actionable fraud.' " (*Joanaco Projects, Inc.* v. *Nixon & Tierney Constr. Co.,* 248 Cal.App.2d 821, 831 [57 Cal.Rptr. 48]; original italics; 4 Witkin, Summary of Cal. Law (8th ed. 1973) § 453, p. 2717, and cases there cited.)

The loan agreement of June 9, 1967, provided that Glendale shall advance to Marina View $1,627,000 "primarily for the purpose of completing the offsite improvements of Window Hill"; that Glendale will pay into escrow for transmission to Marina View the sum of $1,620,000 which "shall represent the entire amount of money lent or set aside by Glendale Federal for such work of improvement"; and that Marina View agrees that within 18 months of the close of escrow, it will complete the improvement and development of Window Hill by grading and installation and construction of offsite improvements. In addition, extrinsic evidence was adduced to show that the funds were intended to be used exclusively for the Window Hill improvements.

Based upon the terms of the agreement and the extrinsic evidence, the court found that at the time the parties executed the June 9, 1967, agreement, "Marina View, Misbin and Holmes, and each of them, . . . intended to use certain sums from the Glendale Federal loan proceeds *for purposes other than that provided for in the written agreement*" and that "Misbin and Holmes, on behalf of Marina View and Marina View, without Glendale Federal's knowledge, fraudulently and in bad faith, during the period from and after June 15, 1967,

diverted a minimum of $623,000 of Glendale Federal's *loan proceeds earmarked for use on Window Hill*" to other uses and purposes. (Italics supplied.) The court thus found promissory fraud. The promise to use the loan proceeds to improve Window Hill with no intention of doing so constituted promissory fraud.

Misbin and Holmes argue that the loan proceeds were not "earmarked" for Window Hill improvements, that under the written agreement Marina View was not obligated to retain every dollar transmitted to it when the money was not yet needed for the improvements, and that if a "trust" arrangement was intended, Glendale could have required the loan proceeds to be disbursed on a voucher system. Those arguments, however, are ones which should have been and, no doubt were, addressed to the factfinder. ■ The proper interpretation of the parties' written agreement turns not only on the language of the agreement but on the proper resolution of conflicting extrinsic evidence and upon an evaluation of witness credibility. In these circumstances, we are bound by the trial court's construction of the agreement if it is reasonably susceptible to that interpretation. (See *Keane* v. *Smith,* 4 Cal.3d 932, 939 [95 Cal.Rptr. 197, 485 P.2d 261]; *Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versicherunges A.G.,* 3 Cal.3d 434, 445 [91 Cal.Rptr. 6, 476 P.2d 406]; *Price* v. *Shell Oil Co.,* 2 Cal.3d 245, 256 [85 Cal.Rptr. 178, 466 P.2d 722]; *Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].) We find that the trial court's interpretation of the agreement that the loan funds were "earmarked" for the improvement of Window Hill was reasonable.

Misbin and Holmes further contend that inasmuch as the court found that at the time the June 9, 1967, agreement was entered into, they intended to have Marina View complete the offsites on Window Hill, diversion of the funds could not have constituted promissory fraud. The contention is without merit. Although the court found that Misbin and Holmes intended to have Marina View complete the offsites, it found that they believed it would be impracticable to complete the work within 18 months and did not intend to complete them within that period.[7] The

[7]The finding reads: "At the time Marina View and Misbin and Holmes . . . executed the written agreement . . . Misbin and Holmes . . . intended to have Marina View complete the construction and installation of offsite improvements on Window Hill, but they each believed that it would be impracticable to so complete within eighteen months of June 15, 1976 and did not intend to complete said offsite improvements within eighteen months."

finding that Misbin and Holmes intended at some future unspecified time to have Marina View complete the offsites is not inconsistent with the finding that Misbin and Holmes were guilty of promissory fraud in falsely promising to use the loan proceeds for the improvements. In the first place the agreement was to complete the improvements within 18 months, not at some future time at the convenience of Misbin and Holmes. In the second place, the promise which the court found to be false was the promise pertaining to the use of the loan proceeds, not the promised date of completion.

█ Having found that Misbin and Holmes committed a fraud upon Glendale in inducing it to make the Window Hill improvement loan on the false promise to use the funds exclusively for the offsite improvements, the court properly awarded punitive damages. Although punitive damages may not ordinarily be given for breach of contract, whether the breach be intentional, willful, or in bad faith (*Crogan* v. *Metz,* 47 Cal.2d 398, 405 [303 P.2d 1029]; *Miller* v. *National American Life Ins. Co.,* 54 Cal.App.3d 331, 336 [126 Cal.Rptr. 731]; see *Freedman* v. *The Rector,* 37 Cal.2d 16, 21-22 [230 P.2d 629, 31 A.L.R.2d 1]), such damages may be awarded where a defendant fraudulently induces the plaintiff to enter into a contract.[8] (*Kuchta* v. *Allied Builders Corp.,* 21 Cal.App.3d 541, 549 [98 Cal.Rptr. 588]; *Horn* v. *Guaranty Chevrolet Motors,* 270 Cal.App.2d 477, 484 [75 Cal.Rptr. 871].) The words "oppression, fraud, or malice" in Civil Code section 3294 being in the disjunctive, fraud alone is an adequate basis for awarding punitive damages. (*Miller* v. *National American Life Ins. Co., supra,* 54 Cal.App.3d 331, 336; *Horn* v. *Guaranty Chevrolet Motors, supra,* 270 Cal.App.2d 477, 484.)

We conclude that the attacks upon the award of exemplary damages are nonmeritorious.

B. *Election of Remedies Defense*

Misbin and Holmes contend that the doctrine of election of remedies barred Glendale from recovering on its cause of action for fraud. The trial court rejected this defense and we do likewise.

---

[8]While a breach of the implied covenant of good faith and fair dealing may give rise to a cause of action sounding in tort in the insurance field (*Silberg* v. *California Life Ins. Co.,* 11 Cal.3d 452, 460-461 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Gruenberg* v. *Aetna Ins. Co.,* 9 Cal.3d 566, 575 [108 Cal.Rptr. 480, 510 P.2d 1032]; *Fletcher* v. *Western National Life Ins. Co.,* 10 Cal.App.3d 376, 401 [89 Cal.Rptr. 78, 47 A.L.R.3d 286]), we are not aware of any appellate court case, and none has been cited, extending that principle to other contractual relationships.

The argument is premised on the following facts: The day Glendale filed its action against Misbin and Holmes for breach of the completion guarantee agreement, it caused a writ of attachment to be issued against Misbin and Holmes to satisfy a stated demand of $75,000. A few days later, pursuant to written instructions from Glendale, the sheriff served a notice of garnishment upon United California Bank. In response the bank reported that it was holding properties belonging to Mr. and Mrs. Holmes consisting of various certificates of deposit and a promissory note secured by a trust deed, all subject, however, to the bank's prior lien. Later in the same month Glendale obtained a second writ of attachment against Misbin and Holmes for a stated demand of $365,000, also based on the Window Hill guarantee agreement. Pursuant to the writ, a notice of garnishment was again served on United California Bank respecting any property held by the bank belonging to Misbin or Holmes. With respect to Holmes, the bank's response was the same as its response to the first garnishment. As to Misbin, the response was that the bank did not hold any property belonging to him. Misbin and Holmes thereafter made a motion to have the writs of attachment discharged. The motion was denied and Misbin and Holmes filed a "summary motion" before this court, unopposed by Glendale, to have the orders denying the motion to discharge the writs of attachment vacated. On the authority of *Randone* v. *Appellate Department,* 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13] (decided after the trial court had denied the motion to discharge the writs), this court in an unpublished opinion directed the writs to be discharged. (4 Civ. 11562, Jan. 20, 1972.)

▄▄▄▄ Misbin and Holmes rely upon the proposition that one who obtains an attachment in pursuit of a contract remedy is estopped to pursue a tort remedy based upon the same set of facts, citing *Estrada* v. *Alvarez,* 38 Cal.2d 386, 391 [240 P.2d 278]; *Steiner* v. *Rowley,* 35 Cal.2d 713, 720 [221 P.2d 9]; *Barrett* v. *Hammer Builders, Inc.,* 195 Cal.App.2d 305 [16 Cal.Rptr. 49]; and *Eistrat* v. *Brush Industrial Lumber Co.,* 124 Cal.App.2d 42 [268 P.2d 181]. Glendale relies on *Symcox* v. *Zuk,* 221 Cal.App.2d 383 [34 Cal.Rptr. 462] (hg. den.) which held that the principles enunciated in the cited cases are applicable only where "one primary right was violated and the various counts or causes of action were all directed at the vindication of that right." (At p. 391.) Misbin and Holmes urge that *Symcox* is irreconcilable with the Supreme Court decision in *Estrada* and that we should, therefore, decline to follow it.

While we are at liberty to disagree with *Symcox,* we choose not to do so. We believe the decision is sound and should be followed. The doctrine of election of remedies is but a specific application of the doctrine of equitable estoppel. (*Commercial Centre R. Co.* v. *Superior Ct.,* 7 Cal.2d 121, 129 [59 P.2d 978, 107 A.L.R. 714]; see *Flack* v. *Boland,* 11 Cal.2d 103, 107 [77 P.2d 1090].) The doctrine rests on the rationale that when plaintiff has pursued a remedy which is inconsistent with an alternative remedy and thereby causes the defendant substantial prejudice, plaintiff should be estopped from pursuing the alternative remedy. Here, as in *Symcox,* the cause of action for fraud was not inconsistent with the remedy for breach of contract and the operative facts giving rise to each cause of action are different. The contract cause of action was for breach of the agreement guaranteeing completion of the Window Hill improvements whereas the fraud cause of action was based on the false promise on behalf of Marina View that the loan funds would be expended solely for the Window Hill offsites. Thus, each cause of action arose out of different obligations and different operative facts.

Furthermore, the doctrine of election of remedies, bottomed upon the equitable principle of estoppel, operates only where pursuit of alternative and inconsistent remedies substantially prejudices the defendant. (*Pac. Coast Cheese, Inc.* v. *Sec.-First Nat. Bk.,* 45 Cal.2d 75, 80 [286 P.2d 353]; *Commercial Centre R. Co.* v. *Superior Ct., supra,* 7 Cal.2d 121, 129; *Felix* v. *Workmen's Comp. Appeals Bd.,* 41 Cal.App.3d 759, 763-764 [116 Cal.Rptr. 345]; 2 Witkin, Cal. Procedure (2d ed. 1970) § 119, pp. 989, 998-1000.) Misbin and Holmes did not suffer substantial prejudice as a result of the writs of attachment. The garnishments did not prevent Misbin or Holmes from using their properties. The properties belonging to the Holmes which were affected by Glendale's attachment were already in the possession of and subject to United California Bank's prior lien. As to Misbin, no property belonging to him was levied upon. In addition, the writs were set aside on a "summary motion" before this court, unopposed by Glendale. There was thus no prejudice or hardship precipitated by Glendale's writs of attachment.

In addition, the doctrine of election of remedies is applicable only where the remedy initially pursued is a real remedy available to the plaintiff. If plaintiff is mistaken and attempts to avail himself of a remedy to which he is not legally entitled, he is not thereby precluded from pursuing the alternative remedy. (*Atchison etc. Ry. Co.* v. *Superior Court,* 12 Cal.2d 549, 555 [86 P.2d 85]; *Verder* v. *American Loan Society,*

1 Cal.2d 17, 32-33 [32 P.2d 1081]; *Felix* v. *Workmen's Comp. Appeals Bd.,* *supra,* 41 Cal.App.3d 759, 763-765.) ▮ In light of *Randone* v. *Appellate Department, supra,* 5 Cal.3d 536, Glendale was mistaken in securing issuance of a writ of attachment on an ex parte application. Following discharge of the writs, Glendale made no further attempt to have writs of attachment issued.

Election of remedies is a harsh doctrine and is currently looked upon with disfavor by courts and commentators. (*Perkins* v. *Benguet Cons. Min. Co.,* 55 Cal.App.2d 720, 755-756 [132 P.2d 70]; see *Friederichsen* v. *Renard,* 247 U.S. 207, 213 [62 L.Ed. 1075, 1084, 38 S.Ct. 450]; 2 Witkin, Cal. Procedure (2d ed. 1970) § 113, p. 982, and authorities there cited.) For the reasons expressed above, we conclude that the trial court properly rejected the defense in the instant case.

▮ In a related contention, Misbin and Holmes urge that even if Glendale was not barred by the doctrine of election of remedies from pursuing both the fraud and contract causes of action, the trial judge was compelled to make an election as to which cause of action should ultimately prevail. The entire argument is premised on the theory that the two causes of action were inconsistent. As we have explained, they were not. The trial court was obligated to grant the remedy to which Glendale was entitled on each cause of action. The court found fraud and breach of contract but, in order to avoid double recovery, properly made but a single award of compensatory damages on both causes of action. We find no impropriety in the court's action.

### C. *Defense Based on the Antideficiency Statutes*

▮ It is next urged that by foreclosing on its trust deed, Glendale was barred by Code of Civil Procedure sections 580b and 580d from maintaining its action for fraud against Misbin and Holmes.[9] The contention is also nonmeritorious.

---

[9]Code of Civil Procedure section 580b provides: "No deficiency judgment shall lie in any event after any sale of real property for failure of the purchaser to complete his contract of sale, or under a deed of trust, or mortgage, given to the vendor to secure payment of the balance of the purchase price of real property, or under a deed of trust, or mortgage, on a dwelling for not more than four families given to a lender to secure repayment of a loan which was in fact used to pay all or part of the purchase price of such dwelling occupied, entirely or in part, by the purchaser.

"Where both a chattel mortgage and a deed of trust or mortgage have been given to secure payment of the balance of the combined purchase price of both real and personal property, no deficiency judgment shall lie at any time under any one thereof if no

The defense of sections 580b and 580d proscribing deficiency judgments is not available to the trustor as a defense to an action by the beneficiary for fraud. (See *Kass* v. *Weber,* 261 Cal.App.2d 417, 422-423 [67 Cal.Rptr. 876]; *Baumrucker* v. *American Mortgage Exchange, Inc.,* 250 Cal.App.2d 451, 459 [58 Cal.Rptr. 677]; *Joanaco Projects, Inc.* v. *Nixon & Tierney Constr. Co., supra,* 248 Cal.App.2d 821, 824; *Pastor* v. *Younis,* 238 Cal.App.2d 259 [47 Cal.Rptr. 684]. See also Hetland, Cal. Real Estate Secured Transactions (Cont.Ed.Bar 1970) § 6.41, p. 300.) The statutes only proscribe deficiency judgments; an action for damages for fraud is not one for a deficiency judgment.

■ The statutory provisions barring deficiency judgments were not intended to immunize a trustor or a third person who tortiously injures the mortgagee's security interest. A mortgagee whose secured interest has been impaired by tortious conduct of·a third person is not barred by the antideficiency statutes from recovering damages for such impairment of security. (*American Sav. & Loan Assn.* v. *Leeds,* 68 Cal.2d 611, 614-615, fn. 2 [68 Cal.Rptr. 453, 440 P.2d 933].) Nor do the statutes bar recovery of damages against the mortgagor for impairment of the security caused by "bad faith" waste. (*Cornelison* v. *Kornbluth,* 15 Cal.3d 590, 603-605 [125 Cal.Rptr. 557, 542 P.2d 981].)

Misbin and ·Holmes cite *Kass* v. *Weber, supra,* 261 Cal.App.2d 417, and urge that the necessary implication of that case is that the beneficiary may not maintain an action for damages for fraud unless he rescinds the loan transaction and offers to return the security. While in *Kass* the beneficiary offered to rescind and tendered a quitclaim deed to the trustor, rescission was significant only because the beneficiary had bid in the property at the foreclosure sale for the entire balance of the indebtedness. Rescission thus prevented double recovery. In the case at bench, Glendale's credit bid was for less than the balance of the indebtedness and there was no double recovery.

---

deficiency judgment would lie under the deed of trust or mortgage on real property."

Code of Civil Procedure section 580d provides: "No judgment shall be rendered for any deficiency upon a note secured by a deed of trust or mortgage upon real property hereafter executed in any case in which the real property has been sold by the mortgagee ·or trustee under power of sale contained in such mortgage or deed of trust.

"The provisions of this section shall not apply to any deed of trust, mortgage or other lien given to secure the payment of bonds or other evidences of indebtedness authorized or permitted to be issued by the Commissioner of Corporations, or which is made by a. public utility subject to the provisions of the Public Utilities Act."

Misbin and Holmes cite *Schumacher* v. *Gaines,* 18 Cal.App.3d 994 [96 Cal.Rptr. 223], for the proposition that the antideficiency statutes preclude a seller of real estate, after a nonjudicial sale under a trust deed, from recovering from the trustor damages for waste and fraud. Reliance on *Schumacher* is misplaced. That case merely stands for the proposition that a beneficiary who bids in the property at a nonjudicial foreclosure sale for the full amount of the indebtedness cannot recover damages for waste. (See *Cornelison* v. *Kornbluth, supra,* 15 Cal.3d 590, 606-607.) *Cornelison* v. *Kornbluth, supra,* holds that a beneficiary who purchases the property at a foreclosure sale for less than a full credit bid may recover damages for "bad faith" waste committed by the trustor, the measure of damages being the difference between the amount of his bid and the outstanding indebtedness immediately prior to the foreclosure sale. (*Id.,* at pp. 606-607.)

We conclude that the trial court properly rejected the defense based on Code of Civil Procedure sections 580b and 580d.

D. *Damages Suffered by Glendale*

Misbin and Holmes contend that whether their liability be predicated on fraud or breach of contract, the trial court's findings compel the conclusion that Glendale suffered no damage.

(1) First it is urged that the trial court applied the wrong standard for ascertaining market value of the properties and that had the correct standard been applied, market value, according to the court's own findings, would have exceeded Marina View's indebtedness to Glendale. It follows, so the argument goes, that Glendale suffered no damage either as a result of fraud or breach of contract.

The findings pertinent to this contention were as follows: As of the date of foreclosure (Aug. 10, 1971) the market value of the properties if sold as three independent parcels was $9,300,000. However, the court added that if the properties were sold "on typical financing as used in Orange County," the values would have to be adjusted upward by 20

percent.[10] The court found that as of the date of foreclosure the total secured indebtedness of Marina View to Glendale was $10,989,642.91 and that, therefore, Glendale was not then fully secured.

Misbin and Holmes argue that the market value should have been based on an assumed sale on "usual and customary terms" and if that standard had been applied, according to the court's findings the market value of the properties would have been $11,160,000, a sum in excess of the secured indebtedness, and hence Glendale suffered no damage.

As we have explained, the proper measure of damages for the fraudulent diversion of loan funds or for the breach of the Window Hill completion guarantee agreement is the loss of the enhancement in value of Glendale's security. Where the measure of damages turns on the value of property, whether liability sounds in tort or breach of contract, the normal standard is market value. (*Bagdasarian* v. *Gragnon*, 31 Cal.2d 744, 752-753 [192 P.2d 935] and cases there cited; *Abrams* v. *Motter*, 3 Cal.App.3d 828, 840-841 [83 Cal.Rptr. 855]; McCormick, Damages (1935) § 44, p. 165.) The definition of market value and the principles governing its ascertainment are the same as those applicable to the valuation of property in eminent domain proceedings (*Bagdasarian* v. *Gragnon*, *supra*, 31 Cal.2d 744, 752-754) and in ad valorem taxation of property (*De Luz Homes, Inc.* v. *County of San Diego*, 45 Cal.2d 546, 561-563 [290 P.2d 544]; *Kaiser Co.* v. *Reid*, 30 Cal.2d 610, 623 [184 P.2d 879].)

In *Sacramento etc. R. R. Co.* v. *Heilbron*, 156 Cal. 408, at page 409 [104 P. 979], market value was defined as "the highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was

[10] The 20 percent adjustment was based on the report of Mr. George Jones, the court appointed appraiser. Mr. Jones assumed the normal or typical financing to be 15 percent to 20 percent down payment with the balance secured by a purchase money trust deed with 7 percent annual interest and customary principal amortization over 10 years with reasonable release clause provisions. He applied a 20 percent discount rate to the value based on an assumed sale on terms in order to arrive at a market value on a cash basis. As Misbin and Holmes point out, there is a difference between adjusting the cash value upward 20 percent in order to arrive at the value of the property if sold on terms and Mr. Jones' method of discounting the value based on an assumed sale on terms in order to arrive at a value based on a cash sale. However, this difference is irrelevant in view of our conclusion that the court properly based its finding of market value on an assumed sale for cash.

adapted and for which it was capable." That classic exposition with subsequent refinements has always been the accepted definition of market value in California. (*Klopping* v. *City of Whittier,* 8 Cal.3d 39, 43 [104 Cal.Rptr. 1, 500 P.2d 1345]; *Merced Irrigation Dist.* v. *Woolstenhulme,* 4 Cal.3d 478, 488 [93 Cal.Rptr. 833, 483 P.2d 1]; *People* ex rel. *Dept. Pub. Wks.* v. *Lynbar, Inc.,* 253 Cal.App.2d 870, 880-882 [62 Cal.Rptr. 320]. Former Evid. Code, § 814; Code Civ. Proc., § 1263.320 [added by Stats. 1975, operative July 1, 1976].[11])

The *Heilbron* definition assumes the highest price obtainable for the property if sold for cash or its equivalent as distinguished from a credit sale. (*Abrams* v. *Motter, supra,* 3 Cal.App.3d 828, 840-841.) In fact, *Heilbron, supra,* 156 Cal. at pages 412-413, approved a series of instructions to the jury referring to market value as the price the land would sell for "cash" or what a person would have paid for the property "in cash." This is also the rule followed in the overwhelming majority of jurisdictions in the United States. (4 Nichols, The Law of Eminent Domain (3d ed. rev. 1971) § 12.1, pp. 12-17—12-21; 1 Orgel, Valuation under Eminent Domain (1953) § 17, pp. 81-83; see McCormick, Damages, *supra,* pp. 167-168.)

The issue was squarely considered in *Abrams* v. *Motter, supra,* 3 Cal.App.3d 828, a vendor's action for damages for breach of a contract to purchase real property. The reviewing court reversed a judgment in favor of the vendor on grounds not here pertinent but in so doing set forth guidelines to be followed by the trial court for the ascertainment of the vendor's damages. The court noted that the trial court used the correct legal measure of damages, the excess of the contract price over the market value on the date of the breach, but that the record was unclear as to how the court determined market value. In its directions for retrial, the reviewing court stated: "[I]f the issue of loss of bargain damages is relitigated, the market value on the date of breach should be estimated on an all-cash-to-seller basis. To be fair to Motter, in

---

[11]Code of Civil Procedure section 1263.320 provides:

"(a) The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available.

"(b) The fair market value of property taken for which there is no relevant market is its value on the date of valuation as determined by any method of valuation that is just and equitable." (Stats. 1975, ch. 1275, § 2, operative July 1, 1976.)

measuring loss of bargain damages, equivalents should be compared. Since by legal definition the date of breach standard is one based on an all-cash concept, the equivalents should be cash to cash, and this requires converting the contract price from its part-term basis to a full cash one. (Cf. *Riley* v. *District of Columbia Redevelopment Land Agency* (1975) 246 F.2d 641 [100 App.D.C. 360].) What figure will be arrived at will depend on evidence at retrial relating to this feature. Generally (but probably not always) a discount of the promissory note involved is in order, based on various factors, including but not limited to the value of the real property securing the note (cf. *Harold* v. *Pugh,* 174 Cal.App.2d 603 [345 P.2d 112]), the amount of prior encumbrances (cf. *Harold* v. *Pugh, supra*), the terms of the note (cf. *Chesapeake & Ohio R. R.* v. *Kelly,* 241 U.S. 485 [60 L.Ed. 1117, 36 S.Ct. 630]), risk of economic changes during the term of the note, risk of expense of foreclosure and risk of change in interest rates." (At p. 841.)

Misbin and Holmes attempt to avoid the well settled principle that market value is to be based upon an assumed sale for cash or its equivalent by citing two authorities: *Buena Park School Dist.* v. *Metrim Corp.,* 176 Cal.App.2d 255 [1 Cal.Rptr. 250], and Condemnation Practice in California (Cont.Ed.Bar 1973). Neither of the cited authorities supports the position advocated.

In *Buena Park School Dist.* v. *Metrim Corp., supra,* 176 Cal.App.2d 255, the court held that as a general rule it is error to instruct the jury that market value is the highest price for which the property could be sold "upon usual and customary terms." However, even though the jury instructions in *Metrim* did include the phrase "upon usual and customary terms," the court found no prejudice because no evidence had been introduced of "any valuation based on 'terms.'" (At p. 264.)

Misbin and Holmes rely on the following passage from *Buena Park School Dist.* v. *Metrim Corp., supra,* 176 Cal.App.2d 255: "Appellant contends that the sale must be for 'cash.' This is not correct. The classic definition is the 'highest price estimated in terms of money.' This language was carefully chosen. It contemplates a value expressed in terms of money, which means *cash or its equivalent.* The thought conveyed is that it is the amount which would be given by a purchaser either in *cash or its equivalent.* The manner of the actual sale is not involved. Whether a purchaser would pay cash or would give considera-

tions of *equivalent value* is not vital, so long as the fair market value governs." (At p. 264; italics supplied.)

Misbin and Holmes seize upon the words "The manner of the actual sale is not involved." However, in context, it is apparent that the court was simply saying that the sale could be for cash or its equivalent. Indeed, in the face of the court's earlier statement in the same paragraph that the definition of fair market value assumed that "the purchaser, whoever he may be, has ample funds to make the purchase" (at p. 264) and its pronouncement that as a general rule it is error to instruct the jury that market value is the amount for which the property could be sold "upon usual and customary terms," (at p. 264) the sentence relied upon cannot be read as an endorsement of the proposition that market value is the highest price obtainable on a sale on "usual and customary terms."

The passage in Condemnation Practice in California (Cont.Ed.Bar 1973) upon which Misbin and Holmes rely (§ 4.33, p. 62) simply summarizes the holding of *Buena Park School Dist.* v. *Metrim Corp.,* *supra,* 176 Cal.App.2d 255. It lends no support to their contention that market value may be based on an assumed sale on terms.

▮ The principle that market value in eminent domain proceedings assumes the highest price obtainable on a sale for *cash or its equivalent* rather than on terms logically follows from the fact that a judgment in condemnation requires the condemner to pay cash for the property, not a down payment with balance payable on terms. The same is true of a judgment for damages; the judgment debtor must pay the amount of the award in cash. This is not to say that a sale of comparable property on terms may not be considered by an appraiser as an indication of the market value of the subject property if the price is properly discounted to reflect what the property would sell for cash. (*Abrams* v. *Motter, supra,* 3 Cal.App.3d 828; McCormick, Damages, *supra,* pp. 167-168.) An appraiser when referring to a comparable sale may explain any adjustments that must be made in the sale price in utilizing the sale as an indication of the market value of the subject property. (*Merced Irrigation Dist.* v. *Woolstenhulme, supra,* 4 Cal.3d 478, 501-503; *San Bernardino County Flood Control Dist.* v. *Sweet,* 255 Cal.App.2d 889, 905 [63 Cal.Rptr. 640].) This is what Mr. George Jones, the court appointed appraiser, did in arriving at the market value of the properties in question.

We conclude that the trial court used the proper standard in determining the market value of the properties.[12]

(2) It is next urged that the court's finding that Glendale was fully secured when the loan was made "in that the then fair market value of the real property security on which it had a lien was no less in amount than the value of the funds which it lent to Marina View" precluded the award of damages for promissory fraud.

The argument is premised on the out-of-pocket measure of damages for fraud codified in Civil Code section 3343. That section provides in pertinent part: "(a) One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction, . . . ."[13]

Although Civil Code section 3343 precludes recovery of antici-pated profits (the benefit of the bargain rule), the statute does not require the damages to be invariably calculated solely on the difference in value between market price and purchase price at the time of the purchase; the section must be applied realistically so as to give the defrauded person his actual out-of-pocket loss and where necessary to reach that result, courts must consider subsequent circumstances. (*Garrett* v. *Perry,* 53 Cal.2d 178, 184 [346 P.2d 758]; *Feckenscher* v. *Gamble, supra,* 12 Cal.2d 482, 499-500; *Ford* v. *Cournale,* 36 Cal.App.3d 172, 183-184 [111 Cal.Rptr. 334]; *Burkhouse* v. *Phillips,* 18 Cal.App.3d 661, 665 [96 Cal.Rptr. 197].) This is particularly true in the case of promissory fraud such as was found by the court in the case at bench. In cases of

---

[12]The parties discuss at considerable length whether Misbin and Holmes were precluded from contending that the market value of the properties exceeded Marina View's secured indebtedness. Glendale argues that (1) the credit price for which it purchased the properties on the foreclosure sale was conclusive as to value of the security and (2) that Misbin and Holmes were collaterally estopped from attacking the determination of the bankruptcy court that Marina View had "no realizable equity" in the properties because the value of the property as of the date of foreclosure was less than $10 million. In view of our conclusion that the trial court employed the proper measure for determining market value and our further conclusion that Glendale's contention that it was entitled as a matter of law to some $4 million damages is nonmeritorious, the foregoing contentions are irrelevant and need not be considered.

[13]Civil Code section 3343 in its present form (as amended by Stats. 1971, ch. 943, § 1, p. 1850) was in effect on the date of trial and was, therefore, controlling. (*Feckenscher* v. *Gamble,* 12 Cal.2d 482, 499-500 [85 P.2d 885].)

promissory fraud, the damages are measured by market value as of the date the promise was breached because that is the date when the damage occurred. (See *Pao Ch'en Lee* v. *Gregoriou,* 50 Cal.2d 502 [326 P.2d 135]; Cal. Attorneys' Damage Guide (Cont.Ed.Bar 1974) p. 53.) As we have explained, damages for *breach* of the completion guarantee agreement must be measured by the difference in value of the property with and without the improvements as of the date of foreclosure. We see no rational basis for holding that a different date of value should govern where liability is predicated on a breach of a false promise.

Misbin and Holmes argue that impairment of the value of Glendale's security was attributable to the depressed condition of the real estate market as of the date of foreclosure and not to the fraud. It is, therefore, urged that an award for damages for fraud was improper. The contention lacks merit.

The trial court limited its award to the difference in value of Window Hill with and without the promised improvements; it did not make an award for the full amount of the deficiency as requested by Glendale. The damages awarded are analogous to damages for "bad faith" waste committed by a trustor which our Supreme Court recently held is "within the province of the trier of fact to determine on a case by case basis to what, if any, extent the impairment of the mortgagee's security has been caused . . . by the general decline of real property values and to what, if any, extent . . . by the bad faith acts of the mortgagor, such determination . . . being subject to review under the established rule of appellate review." (*Cornelison* v. *Kornbluth, supra,* 15 Cal.3d 590, 604, fn. omitted.) In the case at bench, the court found that Glendale's security had been impaired to the extent of $700,000 as a direct result of the fraudulent diversion of loan funds.

 (3) Misbin and Holmes contend that the trial court's determination that Glendale was not fully secured as of the date of foreclosure was erroneous because it improperly included accrued interest of $1,181,864.98 and late charges in the sum of $913,727.88 in arriving at the total secured indebtedness as of the date of foreclosure which it found to be $10,989,642.91. It is argued that under Civil Code section 3343 Glendale was only entitled to out-of-pocket damages, that interest and late charges are not "out-of-pocket expenses" and hence should not have been included in determining whether or not Glendale was fully

secured. Since, as we explain below,[14] the late charges were not a factor in the award, the only question is whether accrued interest was properly included in ascertaining the total secured indebtedness found by the court.

Misbin and Holmes contend that the only interest that could properly be considered under the out-of-pocket rule would have been interest on the damages awarded. The contention is without merit. As we have explained, the out-of-pocket rule of Civil Code section 3343 does not compel calculation of damages solely on the basis of the value of what plaintiff gave up and what he received as of the date of the initial transaction. The section expressly authorizes an award of "any additional damage arising from the particular transaction, including any of the following: . . . (2) An amount which would compensate the defrauded party for loss of use and enjoyment of the property to the extent that any such loss was proximately caused by the fraud."

As we have heretofore noted, the impairment of Glendale's security resulting from the fraudulent diversion of the loan funds is analogous to the impairment of security for "bad faith" waste committed by a trustor. In *Cornelison* v. *Kornbluth, supra,* 15 Cal.3d 590, the court held that where the mortgagee bids less than the full amount of the obligation, his security has been impaired and "he may recover damages for waste in an amount not exceeding the difference between the amount of his bid and the *full amount of the outstanding indebtedness immediately prior to the foreclosure sale.*" (15 Cal.3d at p. 607, italics supplied.) The same principle should govern in determining the ceiling on Glendale's recovery of damages for fraud. The $700,000 compensatory award did not exceed that limit.

Misbin and Holmes make the further contention that under the "out-of-pocket" damage rule, portions of the loan proceeds used to purchase the Krum Ranch and to prepay interest should have been excluded because they were paid to Glendale. The contention is specious. If the property had been purchased from a third person, it

---

[14]Glendale concedes the late charges are not a proper component of the damages awarded, but correctly points out that their inclusion in the court's finding of total indebtedness is immaterial. The amount of the indebtedness less the late charges was $10,075,915.03 ($10,989,642.91 minus $913,727.88) and the value of the security as found by the court was $9,300,000. The difference between the figures exceeds the $700,000 compensatory damages awarded. Consequently, the "late charges" were not a factor in the ultimate award.

would be absurd to suggest that Glendale was not out of pocket to the extent of funds loaned to finance the purchase. The fact that the purchase was made from Glendale makes no difference; the funds were still loaned to Marina View to enable it to make the purchase. Glendale parted with both the loan funds and the ranch; although it was paid for the property, the loan was never repaid.

(4) Finally, it is urged that there was no evidence to support the finding that the difference in value of Window Hill with and without the offsite improvements was $700,000. Misbin and Holmes contend that the only pertinent evidence on the issue was Misbin's testimony that it would have been a complete waste of money to have constructed the offsites and that they would not have added to the value of the property. The argument lacks merit.

The cost of completing the offsites which the court found to be $900,000 was competent, though not conclusive, evidence of the difference in value of the property with and without the improvements. (See Ann., Agreement to Protect Mortgagees—Damages, 103 A.L.R. 1395, 1397, and cases collected.) Reproduction cost is one of three accepted approaches a valuation witness may consider in forming his opinion of market value in eminent domain proceedings. Evidence Code section 820 provides: "When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the value of the property or property interest being valued as indicated by the value of the land together with the cost of replacing or reproducing the existing improvements thereon, if the improvements enhance the value of the property or property interest for its highest and best use, less whatever depreciation or obsolescence the improvements have suffered." Thus the cost of completing the offsites was substantial evidence to support the trial judge's finding that the improvements would have enhanced the value of Glendale's security by $700,000.

In his memorandum opinion of June 8, 1973, the trial judge pointed out the difficulty of determining the effect construction of offsites would have had on the value of Window Hill, particularly because there were no working plans for the improvements. He stated that in arriving at his estimate of the difference in value, he considered, among other indications of value, the fact that at least $600,000 had been spent in improving Window Hill and that the value of that parcel increased from approximately $1.2 million in June 1967 to $1.8 million in August 1971.

The fact that the difference in value was difficult to determine is not a ground for invalidating the award. ▆ A plaintiff must show with reasonable certainty that he has been damaged because of the wrongful conduct of the defendant, but " ' "once the cause and existence of damages have been so established, recovery will not be denied because the damages are difficult of ascertainment." (*Stott* v. *Johnston,* 36 Cal.2d 864, 875 [229 P.2d 348, 28 A.L.R.2d 580].) Liability cannot be evaded because damages cannot be measured with exactness.' " (*Schroeder* v. *Auto Driveaway Co., supra,* 11 Cal.3d 908, 920-921, quoting *Martin* v. *Town & Country Development,* 230 Cal.App.2d 422, 429 [41 Cal.Rptr. 47, 10 A.L.R.3d 1347].)

### E. *Attorney Fees Awarded on the Fraud Cause of Action*

▆ Misbin and Holmes attack the award of attorneys' fees in the sum of $30,000 on the fraud cause of action. The court found that "Glendale Federal has suffered additional damages in the amount of $30,000, which sum represents reasonable attorneys' fees in recovering damages for fraud in this action." Misbin and Holmes urge that attorneys' fees incurred in prosecuting a fraud cause of action are not recoverable.

Although as a general rule attorneys' fees incurred by a plaintiff in an action for damages for fraud are nonrecoverable (*Bezaire* v. *Fidelity & Deposit Co.,* 12 Cal.App.3d 888, 892 [91 Cal.Rptr. 142]; *Heffernan* v. *Bennett & Armour,* 110 Cal.App.2d 564, 588 [243 P.2d 846]; see Code Civ. Proc., § 1021), an exception is recognized where a plaintiff, as a proximate result of defendant's fraud, is required to prosecute or defend an action against a third party for the protection of his interest. (*Prentice* v. *North Amer. Title Guar. Corp.,* 59 Cal.2d 618, 620 [30 Cal.Rptr. 821, 381 P.2d 645].) In such cases reasonable attorneys' fees incurred in connection with the third party lawsuit are recoverable as damages caused by defendant's tortious act. (*Prentice* v. *North Amer. Title Guar. Corp., supra*; *Roberts* v. *Ball, Hunt, Hart, Brown & Baerwitz,* 57 Cal.App.3d 104, 112 [128 Cal.Rptr. 901].)

In the case at bench the $30,000 attorneys' fee award was properly made under the exception to the general rule. Although the court's finding that Glendale suffered additional damages in the sum of $30,000 in the form of attorneys' fees "in recovering damages for fraud in this action" is ambiguous, the record of the hearings on the objections to the

findings reveal that the award was properly made under the exception to the general rule. Glendale originally proposed a finding awarding it $100,000 attorneys' fees in pursuing its cause of action for the fraudulent diversion of loan funds for the Window Hill improvements. Misbin and Holmes objected to the proposed finding on the ground that it is improper to award attorneys' fees in a fraud action. In response, Glendale contended that it was entitled to recover attorneys' fees incurred in the bankruptcy litigation instituted by Marina View, pointing out that there was evidence that Glendale incurred attorneys' fees and disbursements in the sum of $76,631.75 in that proceeding. As has been noted, Misbin, Holmes and Reed had Marina View record the "off-record mortgage," instituted chapter XI proceedings on behalf of Marina View and obtained an order enjoining Glendale's foreclosure on the ground the "unrecorded mortgage was a prior lien." Glendale was compelled to litigate that issue in the bankruptcy court and ultimately obtained an order resulting in the subordination of the "unrecorded mortgage." Following hearings on the objection to the proposed finding, the court made a minute order in which it stated that Glendale "is entitled to attorneys fees as part of its damages in the fraud action" and that "a portion of the attorneys fees, to. wit: $30,000 incurred by Glendale for bringing or defending lawsuits against Marina View, as a result of the fraud of Misbin and Holmes." Thus, although the ultimate finding is ambiguous, the record reveals that the $30,000 attorneys' fees awarded as damages on the fraud cause of action was proper. It represents less than one-half of the attorneys' fees and costs incurred by Glendale in litigating the bankruptcy proceedings instituted by Marina View.[15] ▉ A reviewing court may properly consider the opinion of the trial court (here its minute order) for the purpose of discovering the process by which the trial court arrived at its conclusion and as an aid in interpreting its findings. (*Distribu-Dor, Inc.* v. *Karadanis,* 11 Cal.App.3d 463, 468 [90 Cal.Rptr. 231].)

## F. Attachment Costs

▉ Misbin and Holmes finally contend that the court improperly approved a cost item of $4,125 representing premiums paid by Glendale for surety bonds in connection with the writs of attachment. They make

---

[15]It is significant that although Glendale also argued below that it was entitled to substantial attorneys' fees in defending against Marina View's cross-complaint, the court's award was less than half of that incurred by Glendale in the bankruptcy proceeding.

the bare assertion that the item was improperly allowed because the writs were subsequently discharged on the authority of *Randone* v. *Appellate Department, supra,* 5 Cal.3d 536. The contention is without merit.

The item was properly allowed pursuant to the statutory provision that the prevailing party be awarded costs (Code Civ. Proc., § 1032) and the specific provision allowing recovery of premiums on surety bonds as part of costs (Code Civ. Proc., § 1035). Although the writs were later discharged, it must be presumed that the trial court determined that the costs were incurred in good faith pursuant to the law as it existed at the time the writs were issued. (*Meyer* v. *City of San Diego,* 132 Cal. 35, 36-37 [64 P. 124].) We find no abuse of discretion in the approval of the item as part of the costs incurred by Glendale.

## II

### DAMAGES FOR BREACH OF CONTRACT

Misbin and Holmes attack the judgment awarding Glendale damages for the breach of the Window Hill completion guarantee agreement on the following grounds: (1) Glendale waived its rights under the guarantee agreement and was estopped from enforcing it; (2) performance of the guarantee obligation was excused because of mistake, impossibility of performance, and frustration of purpose; (3) the nonjudicial foreclosure barred the action on the completion guarantee agreement; and (4) Glendale suffered no damages by reason of the breach. For the reasons to be stated, we have concluded the contentions have no merit.

### A. *Defense of Waiver and Estoppel*

With respect to the defense of waiver and estoppel, the court made extensive findings in favor of Glendale and against Misbin and Holmes on these defenses. ■ The existence or absence of a waiver is ordinarily a question of fact. (*Hefferan* v. *Freebairn,* 34 Cal.2d 715, 722 [214 P.2d 386]; *Brewer* v. *Municipal Court,* 193 Cal.App.2d 510, 515 [14 Cal.Rptr. 391].) The same is true of estoppel. (*Albers* v. *County of Los Angeles,* 62 Cal.2d 250, 266 [42 Cal.Rptr. 89, 398 P.2d 129].) These issues are ones of law only when the evidence is not in conflict and is susceptible only of one reasonable inference. (*Driscoll* v. *City of Los*

*Angeles,* 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245]; *Crumpler* v. *Board of Administration,* 32 Cal.App.3d 567, 581 [108 Cal.Rptr. 293].)

██ Furthermore, a reviewing court must start with the presumption that the record contains evidence to sustain every finding of fact; the appellant must demonstrate that there is no substantial evidence to support the challenged findings; one contending the evidence does not support some particular issue of fact must set forth in his brief *all* the material evidence bearing upon that issue and not merely the evidence favorable to him; failure to so state the evidence shall be deemed a waiver of the claimed error. (*Foreman & Clark Corp.* v. *Fallon,* 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362], and cases cited therein; 6 Witkin, Cal. Procedure (2d ed.) Appeal, § 425, pp. 4391-4393.) Misbin and Holmes' brief fails to comply with the foregoing rules and we are disinclined to overlook this omission in view of the monumental size of the record and the fact that all of the issues were exhaustively tried. In the absence of a clear demonstration that there was no evidence to support the trial court's findings on the issues of waiver and estoppel, we presume that the findings are fully supported by the record.

██ On the issue of estoppel, Misbin and Holmes' main contention appears to be that Glendale never made a written demand upon them to perform under the terms of the guarantee agreement. They point to the provision in the agreement that in the event Marina View fails to complete the improvements, "guarantors would upon written demand" either deposit sufficient money to cure the default or cause the work to be completed. The trial court, however, found that Misbin and Holmes made clear by their responsive pleadings in the main action, which pleadings were filed months before Glendale filed its action on the completion guarantee agreement, that they would not complete the Window Hill offsites as required by the terms of the guarantee agreement. The court concluded that "demand by Glendale Federal for performance . . . under the Window Hill completion guaranty . . . was not required since Misbin and Holmes . . . made clear by their pleadings that they would not perform under said guaranty and repudiated it." The law does not require performance of an idle act. (*Beverage* v. *Canton Placer Mining Co.,* 43 Cal.2d 769, 777 [278 P.2d 694]; Civ. Code, § 3532.) In view of the court's finding, which is amply supported by the record, a formal demand for performance would have been an idle act.

## B. *The Defenses of Mistake, Impossibility and Frustration of Purpose*

Misbin and Holmes' contention that they were excused from performance under the Window Hill completion guarantee agreement because of mistake, impossibility of performance and frustration of purpose is likewise nonmeritorious. Though not articulated with clarity, the argument appears to rest on the theory that the evidence showed that it would have been "uneconomical" to install the Window Hill offsites without freeway access to the property and that the parties contracted under the mistaken assumption that such access would soon be available.

A complete answer to the contention is that the exhaustive findings made by the trial court reveal that the court rejected the defenses which are now sought to be reargued on appeal. The court made some 50 pages of findings consisting of 120 "Findings of Fact" and 106 "Conclusions of Law" covering every facet of the case. Although the court did not make specific findings on the defenses of mistake, impossibility and frustration of purpose, Misbin and Holmes did not object to the findings for lack of specific findings on those issues. ■ "A specific finding on each material issue is unnecessary when the findings as a whole clearly show the court's views on all material issues." (*Mehl* v. *People* ex rel. *Dept. Pub. Wks.*, 13 Cal.3d 710, 716 [119 Cal.Rptr. 625, 532 P.2d 489].) These findings made by the court fairly disclose the court's determination of all issues of fact necessary to support the judgment and to overcome pertinent theories of the defense. This is all which findings require. (*McClung* v. *Saito*, 4 Cal.App.3d 143, 152 [84 Cal.Rptr. 44].)

Misbin and Holmes, however, suggest that the finding that Marina View, Misbin and Holmes intended to have Marina View complete the offsites on Window Hill but that they "each believed that it would be impracticable to so complete said offsites within eighteen months" should have led to a finding of mistake. The argument is specious. That finding negates the defense of mistake. ■ The kind of mistake which renders a contract voidable does not include a mistake as to a matter which one of the contracting parties had in mind as a possibility and as to the existence of which he took the risk. (*Guthrie* v. *Times-Mirror Co.*, 51 Cal.App.3d 879, 885 [124 Cal.Rptr. 577], and authorities there cited.)

The suggestion that the evidence established as a matter of law that Misbin and Holmes were excused from performance because of impossi-

bility and frustration of purpose merits little consideration. As to impossibility, the evidence could never support a finding in favor of Misbin and Holmes. There was simply no evidence that performance was "prevented or delayed by an irresistible, superhuman cause, or by the act of public enemies of this state or of the United States, . . ." (Civ. Code, § 1511, subd. 2.) ■ Facts which may make performance more difficult or costly than contemplated when the agreement was executed do not constitute impossibility. (*Butler* v. *Nepple,* 54 Cal.2d 589, 599 [6 Cal.Rptr. 767, 354 P.2d 239].) Since the evidence at bar is devoid of any condition or expense which could not reasonably have been anticipated, Misbin and Holmes cannot eschew their contractual obligations by relying upon the defense of impossibility. (*Ellison* v. *City of San Buenaventura,* 48 Cal.App.3d 952, 962 [122 Cal.Rptr. 167].) ■ With respect to frustration of purpose, the doctrine applies when performance is possible but a supervening, fortuitous event has virtually destroyed the value of the consideration to be rendered. (*Lloyd* v. *Murphy,* 25 Cal.2d 48, 53 [153 P.2d 47]; *Guthrie* v. *Times-Mirror Co., supra,* 51 Cal.App.3d 879, 888, fn. 7.) There was no evidence to support frustration of purpose as an excuse for nonperformance and the court's finding that completion of the improvements would have enhanced the market value of Window Hill constituted a rejection of that defense. As we have heretofore explained, there was substantial evidence supporting the court's finding.

## C. *The Antideficiency Statute*

■ It is next urged that by virtue of Code of Civil Procedure section 580d, the nonjudicial foreclosure sale barred Glendale's enforcement of its rights under the Window Hill guarantee agreement.

Misbin and Holmes' reliance on *Union Bank* v. *Gradsky,* 265 Cal.App.2d 40 [71 Cal.Rptr. 64], is misplaced. *Gradsky* held that a nonjudicial foreclosure precluded an action for deficiency against a guarantor. The decision was based on the principle of estoppel and not on the direct application of Code of Civil Procedure section 580d. The court reasoned that by electing to pursue the remedy of a nonjudicial foreclosure sale, the creditor destroyed the guarantor's right to seek reimbursement from the principal debtor and is, therefore, estopped from pursuing the guarantor for a deficiency. The court added by way of a dictum, however, that since the guarantor's immunity did not rest on Code of Civil Procedure section 580d but on the principle of estoppel, he could by express contract or by subsequent conduct waive or be estopped

from claiming an immunity from liability for a deficiency after a nonjudicial sale.

It has since been squarely held that the protection afforded the guarantor by the *Gradsky* rule may be expressly waived by contract or by conduct. (*Mariners Sav. & Loan Assn.* v. *Neil,* 22 Cal.App.3d 232, 235-236 [99 Cal.Rptr. 238, 49 A.L.R.3d 549]; Hetland, Secured Real Estate Transactions (Cont.Ed.Bar 1974) pp. 232-233.) In the instant case, the completion guarantee agreement which Misbin and Holmes executed contained an express contractual waiver of the *Gradsky* defense.

Misbin and Holmes make the additional argument that they were the "alter ego" of Marina View and are, therefore, entitled to the direct protection of Code of Civil Procedure section 580d. We are unpersuaded. ■ Whether an individual is the alter ego of a corporation is a question of fact "particularly within the province of the trial court." (*Stark* v. *Coker,* 20 Cal.2d 839, 846 [129 P.2d 390].) In view of the court's findings concerning the distinct capacities in which Misbin and Holmes executed the loan documents and the specific finding that they were liable individually under the completion guarantee agreement, the court manifestly rejected the alter ego theory. The evidence did not establish alter ego as a matter of law.

### D. *Proof of Damage*

Finally, Misbin and Holmes repeat the contentions made earlier in connection with the fraud cause of action that there was no proof that Glendale suffered any damages. They again argue that there was no evidence that the difference in market value before and after the improvements was $700,000, that the court used the wrong standard for ascertaining market value, and that the court erred in determining the amount of the total secured indebtedness as of the date of foreclosure. Our earlier discussion of those contentions in connection with the fraud cause of action is dispositive.

CROSS-APPEAL OF MARINA VIEW AND MISBIN
AND HOLMES FROM THE JUDGMENT ON THEIR
RESPECTIVE CROSS-COMPLAINTS FOR
RESCISSION OF THE LOAN AGREEMENTS

The cross-complaint of Marina View, Misbin and Holmes (hereafter cross-complainants) sought rescission of the June 1967 written loan

agreements and the completion guarantee agreements on the ground of fraud and failure of consideration. They also sought a judicial declaration that the rights and obligations of the parties were governed by an oral agreement entered into before the execution of the written agreements. At the close of the cross-complainants' case in chief, the trial court granted Glendale's Code of Civil Procedure section 631.8 motion for judgment against the cross-complainants. In its findings, the court made detailed and specific findings in favor of Glendale on all of the issues raised by the cross-complaint and Glendale's answer and entered judgment accordingly. Cross-complainants have appealed from the judgment.[16]

Cross-complainants argue that they should have prevailed on their theory that they were induced to enter into the loan and guarantee agreements on Glendale's false promises and representations and that they were, therefore, entitled to a decree of rescission. Though not articulated with clarity, the contentions appear to be: (1) There was no evidence to support the trial court's findings in favor of Glendale on the fraud issue and (2) the trial court based its decision on an incorrect application of the parol evidence rule. Neither contention has merit.[17]

I

As to the first ground of attack, in his notice of intended decision the judge stated that "no specific oral promise or representation was made by Glendale Federal officials." In its formal findings, the court found that Glendale made no representations or promises, oral or otherwise, "which are not set forth" in the written loan agreements; that cross-complainants were represented by counsel during the negotiation

[16]Glendale has filed a motion to dismiss the appeal insofar as Marina View is concerned on the ground its corporate powers were suspended on June 9, 1972, by the Franchise Tax Board pursuant to Revenue and Taxation Code section 23301 for nonpayment of franchise taxes. In response to the motion, Marina View has filed a "certificate of Relief from Suspension or Forfeiture" dated August 11, 1976, stating that Marina View "has been relieved of suspension or forfeiture and is now in good standing with the Franchise Tax Board." The revival of Marina View's corporate powers permits it to proceed with its appeal. (*Peacock Hill Assn.* v. *Peacock Lagoon Constr. Co.,* 8 Cal.3d 369, 373-374 [105 Cal.Rptr. 29, 503 P.2d 285].) The motion to dismiss the appeal is, therefore, denied.

[17]Cross-complainants do not attack the court's findings and conclusions rejecting cross-complainants' theory that the rights and obligations of the parties were governed by an oral agreement entered into before the execution of the written loan agreements.

and consummation of the loan transactions; that all parties, including cross-complainants, understood that all prior negotiations, representations and statements were merged in and superseded by the written agreements; and further that even if cross-complainants relied upon any oral promise or representation allegedly made, such reliance was unreasonable.

Avoiding a frontal attack upon the sufficiency of the evidence to support the court's findings, cross-complainants merely summarize some of the evidence favorable to them and argue that they were entitled to a decree of rescission. ■ We emphasize again that it is presumed on appeal that the record contains sufficient evidence to support the trial court's findings and the burden is on the party attacking the findings to set forth in his brief *all* of the evidence bearing upon the factual issues and not simply the evidence favorable to him. Those salutary principles of appellate review extend to findings made pursuant to an order granting a motion for judgment under Code of Civil Procedure section 631.8 as much as to findings made on a trial after evidence has been produced by both sides. (*Rodriguez* v. *North American Rockwell Corp.,* 28 Cal.App.3d 441, 446-447 [104 Cal.Rptr. 678].) Cross-complainants' brief is in clear defiance of those principles; it only recites evidence supporting cross-complainants' theory of fraud without reciting all of the evidence bearing on that issue.

■ We have nevertheless examined the record and find substantial evidence to support the court's findings. Cross-complainants proceeded on the theory that Glendale knew that the payment schedule and other conditions of the loan agreement were unrealistic but induced cross-complainants to accept them under false representations and promises that when payments fell due the loan would be renewed or a new loan would be made and that cross-complainants should not be concerned. Much is made of the fact that inasmuch as Krum Ranch had been acquired by Glendale by deed in lieu of foreclosure, federal regulations required the asset to be carried on Glendale's books as a "scheduled item"; that under federal regulations when the ratio of "scheduled items" to certain other assets of a savings and loan association exceed 4 percent, the association's business operations are restricted in important respects; and that Glendale was anxious to dispose of Krum Ranch because its "scheduled items" were near the maximum ratio. It is argued that the loan transaction and the terms and conditions exacted from cross-complainants were, therefore, designed to serve Glendale's

purposes and that cross-complainants acceded to the harsh terms on the false representations and promises that they would not be expected to live up to the terms.

The record, however, discloses direct testimony by Mr. Hewitt, Glendale's senior vice-president, that no promises or oral agreements were made which went beyond what was contained in the written agreements and that the cross-complainants were never told that they would not have to pay the taxes or the installments of principal and interest as they fell due or to complete the Window Hill improvements as provided in the agreements. Although Mr. Hewitt admitted telling cross-complainants that he would help them over the "rough spots," he testified that this was conditioned upon cross-complainants' keeping their part of the bargain. As a matter of fact, the record shows that Glendale did cooperate by paying the 1970 real property taxes and by delaying its notice of default for a considerable period of time in order to give cross-complainants time to secure financial assistance elsewhere to cure their defaults. The trial court's findings on the fraud issue are amply supported by the evidence.

## II

Cross-complainants' main attack on the judgment on the cross-complaint is that the trial court erroneously ruled that the parol evidence rule precluded consideration of evidence of alleged false promises and representations which were inconsistent with the terms of the written agreements. It is, therefore, urged that the judgment should be reversed.

The contention is nonmeritorious for two reasons: (1) Assuming arguendo that the court was mistaken with respect to the scope of the parol evidence rule, its ruling was nonprejudicial, and (2) the court's ruling was correct under the rule enunciated by the Supreme Court in *Bank of America etc. Assn.* v. *Pendergrass,* 4 Cal.2d 258 [48 P.2d 659].

The record of the trial on the cross-complaint for rescission for fraud reveals the following: At the commencement of the trial, Glendale made a motion to exclude any proof by cross-complainants which would contradict the terms of the written agreements. The court denied the motion subject to Glendale's motion to strike. Trial proceeded and cross-complainants introduced evidence of the alleged false promises

and representations by Glendale. At the close of cross-complainants' case in chief, Glendale moved to strike those portions of the evidence which it felt were in direct contradiction of the terms of the written agreements. The motion was denied. Glendale then made a motion for judgment under Code of Civil Procedure section 631.8. The court granted that motion stating that it specifically found that there were no representations or promises other than those set forth in the written agreements and that the alleged "representations were not made."

Cross-complainants' contention that the order granting the motion for judgment was based on an erroneous application of the parol evidence rule is based on the following colloquy between court and counsel at the time the motion was granted:

"MR. BITTING [cross-complainants' counsel]: Your Honor, may I be heard for one moment?

"THE COURT: You may.

"MR. BITTING: I take it that the Court is ruling that the Parol Evidence rule applies in this case?

"THE COURT: That's really—yes, that's the main ruling.

"MR. BITTING: And my understanding of the Parol Evidence rule is that the Court or the trier of fact may not consider the oral or contemporaneous statements as modifying the written agreement, so that I still cannot understand how the Court can make Findings of Fact upon evidence it cannot consider to modify the written agreement.

"I just want to make that—make my position clear on that, because it seems to me the Parol Evidence rule is a waiveable objection, if it is not raised at the time of trial, or during the course of trial, and the evidence goes in, then it's waived and the party does not rely on the Parol Evidence rule to insulate him from whatever representations he has made during the course of the negotiations, if the parties enter into an integrated written contract.

"Therefore the trier of fact can't even consider what was said and what goes to the circumstances and surrounding execution of the written agreement as provided for in the statute.

"So, I don't see how the Court can make Findings of Fact based upon evidence it cannot consider, because this permits the cross-defendants, Glendale Federal, to rely upon the Parol Evidence rule.

"But to say that even if the Parol Evidence rule doesn't apply we can take our chances both ways.

"THE COURT: Well, I don't see why the Court can't make the findings that way. They are perhaps in the alternative, but they are perfectly consistent, as far as I can see."

In his notice of intended decision, the judge stated: "The court affirms its ruling made on the CCP 631.8 motion that the parol evidence rule would preclude showing of any promises other than those contained in the written agreement, and further that no specific oral promises or representations were made by Glendale Federal officials."

The portions of the record to which we have been directed do not support cross-complainants' contention. Indeed, they make it crystal clear that the trial judge based his order granting the motion for judgment on alternative grounds: First, that the evidence adduced by cross-complainants failed to prove that the alleged false representations and promises were made; secondly, and as an alternative ground, that the parol evidence rule precluded his consideration of the alleged false promises and representations which were in contradiction of the terms of the written agreements. Even if the alternative ground were erroneous, the error could not have prejudiced cross-complainants. They were permitted to introduce evidence of the alleged false representations and promises and a motion to strike that evidence was denied. The court weighed that evidence against conflicting evidence adduced by Glendale and found that no false promises or representations were made. Consequently, whether or not the alternative ground was correct was manifestly immaterial.

Furthermore, the judge's alternative ground of decision based on the parol evidence rule was in accord with *Bank of America etc. Assn.* v. *Pendergrass, supra,* 4 Cal.2d 258. In that case the court held that evidence of an oral promise not to enforce the terms of a promissory note with an unconditional promise to pay was inadmissible as a defense to an action on the note or in an action for its cancellation for fraud. The court declared: "Our conception of the rule which permits parol evidence of

fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing." (4 Cal.2d at p. 263.) This was precisely what Misbin and Holmes sought to prove. They sought to prove that they entered into the loan transactions on Glendale's false promises and representations that it would not enforce the payment schedule of the loan agreement.

Cross-complainants' reliance upon this court's decision in *Coast Bank* v. *Holmes*, 19 Cal.App.3d 581 [97 Cal.Rptr. 30], is misplaced. We there observed that the rule excluding evidence of a false oral promise inconsistent with the terms of the written agreement to prove fraud has been criticized by commentators and that recent decisions of the Supreme Court liberalizing the rule against admissibility of extrinsic evidence may cast some doubt on the continued viability of the rule. However, we did not say that the *Pendergrass* rule is no longer the law; indeed, we applied *Pendergrass* as we were required to do.

We conclude that the trial court correctly applied the parol evidence rule and in any event, even assuming arguendo that it erred in that respect, the error was nonprejudicial.

The judgment on the cross-complaint should be affirmed.

## DISPOSITION

For all of the reasons heretofore stated, it is our conclusion that the able trial judge correctly analyzed and resolved the myriad of complex factual and legal issues involved in this litigation and that the judgment below should be affirmed in its entirety. Each side shall bear its own costs and attorneys' fees incurred on these appeals.[18]

---

[18]The promissory note executed by Marina View and the Window Hill completion guarantee agreement provide for reasonable attorneys' fees to Glendale in any action brought to enforce the terms of the note or the guarantee agreement. Inasmuch as provisions for reasonable attorneys' fees incurred in enforcing a contract embrace legal services rendered on appeal as well as at trial (*Wilson* v. *Wilson*, 54 Cal.2d 264, 272 [5 Cal.Rptr. 317, 352 P.2d 725]), Glendale asks us to award it reasonable attorneys' fees incurred by it in defending against the cross-appeal by Misbin and Holmes and the appeal by Marina View, Misbin and Holmes from the judgment on the cross-complaint for rescission. By the same token, however, by virtue of Civil Code section 1717 (*Coast Bank* v. *Holmes, supra,* 19 Cal.App.3d 581, 596-597) Misbin and Holmes would be entitled to reasonable attorneys' fees for successfully defending against Glendale's

Glendale's motion to dismiss Marina View's appeal is denied (see fn. 16) and the judgment is affirmed.

Kaufman, Acting P. J., and Morris, J., concurred.

Petitions for a rehearing were denied February 7, 1977, and the petitions of all the parties for a hearing by the Supreme Court were denied March 31, 1977.

---

appeal from the judgment. In these circumstances, each side should bear its own attorneys' fees, as well as costs, incurred on this appeal.